**Mary W. SULLIVAN et al., Plaintiffs,**

v.

**CHASE INVESTMENT SERVICES OF BOSTON, INC., a corporation, et al., Defendants.**

**No. C–76–1783–CBR.**

United States District Court,
N. D. California.

June 6, 1978.

---

See also 434 F.Supp. 171.

Anthony P. David, John Bilyeu Oakley, San Francisco, Cal., for plaintiffs.

Steinhart, Goldberg, Feigenbaum & Ladar, Marvin D. Morgenstein, John Curran Ladd, Eliot S. Jubelirer, San Francisco, Cal., for defendants Chase Investment Services of Boston, Inc., Phoenix Investment Counsel of Boston, Inc., Virginia Spencer, Frederick G. Thorne, John P. Chase, Richard A. Spindler.

Dinkelspiel & Dinkelspiel, Bruce W. Belding, San Francisco, Cal., for defendants E. F. Hutton & Company, Inc., and Thomas Williams, Mitchum, Jones and Templeton, Inc., and Harold Harris.

Severson, Werson, Berke & Melchior, Robert L. Lofts, D. Ronald Ryland, San Francisco, Cal., for defendants Monte J. Wallace and Neil W. Wallace.

Arnold & Porter, Richard J. Wertheimer, Paul S. Ryerson, Washington, D. C., McKenna & Fitting, Paul Fitting, Charles G. Miller, San Francisco, Cal., for defendants Sullivan and Worcester, John Hand, and Thomas R. B. Wardell.

Sullivan, Jones & Archer, Richard J. Archer, Lee J. Sclar, San Francisco, Cal., for defendants Dean Witter & Co., Inc., and John Gates.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This is an action brought by four individuals against Chase Investment Services of Boston, Inc. ("CIS"), an investment advisory service, Sullivan & Worcester, a law firm which represented CIS; Dean Witter & Company, Inc. ("Witter"), E. F. Hutton & Company, Inc. ("Hutton"), and Mitchum, Jones & Templeton, Inc. ("Mitchum"), three brokerage houses which were involved in the sale of CIS services; and 21 other individuals and corporations affiliated with these five principal defendants. The lawsuit alleges that the defendants fraudulently marketed the investment advisory services of CIS to approximately 1541 clients from April 1, 1971, through May 31, 1973, and that those clients have a right to recover substantial amounts of money which they lost as a result of this fraud.

In a Memorandum of Opinion filed on March 25, 1977, and reported at 434 F.Supp. 171, the Court concluded that plaintiffs had an implied cause of action under the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–1 et seq., against an investment adviser who defrauds any client or prospective client and against individuals and businesses (including lawyers and law firms) that are not investment advisers but that aid and abet investment advisers in the commission of frauds which violate § 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6. Lewis v. Transamerica Corp., 575 F.2d 237 (9 Cir. 1978) (implied private cause of action against investment advisers). The Court dismissed the claims against some defendants under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., because the sale of investment advisory services does not constitute the sale of a security within the meaning of § 10(b) of the Act, 15 U.S.C. § 78j(b). On June 17, 1977, the remaining defendants stipulated with plaintiffs that because the Court's analysis of the § 10(b) claims applied equally to all defendants, the Court "may dismiss plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5," and plaintiffs reserved the right to try to amend the complaint and to appeal the Court's decision with respect to those claims.

On September 14, 1977, plaintiffs filed a motion to certify a class and several subclasses of CIS clients. Under a stipulated briefing arrangement, defendants filed responsive briefs on October 6 and November 22, and plaintiffs filed additional briefs on October 31 and December 12. On September 22, plaintiffs filed a motion for leave to amend their complaint in a variety of respects, some substantive, but on October 21, they withdrew the motion without any indication that they intended to renew it. On November 18, just four days before defendants' last briefs were due, plaintiffs refiled their motion to amend. The Court heard oral argument on both motions on December 23, 1977.

Having considered the written and oral arguments of counsel and the extensive evi-

dentiary material submitted by the parties,[1] the Court grants in part and denies in part the motions for leave to amend the complaint and for class certification as described below.

### I. *MOTION TO AMEND*

■ The Court grants plaintiffs' motion to file a first amended complaint except with respect to certain class claims against the brokers.

The major substantive disagreement about the propriety of amendment involves claims against the brokers under Rule 10b–5 and various rules of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"). The brokers contend that adding the claim of breach of fiduciary duty to investigate CIS prejudices them because they had an inadequate opportunity to address its implications for class certification in the four days between the refiling of the motion and the due date of their last brief on class certification. Plaintiffs argue that this 10b–5 claim was never dismissed pursuant to the stipulation of June 17, 1977, and that even if it was dismissed, the motion to amend was timely.

The Memorandum of Opinion of March 25, 1977, 434 F.Supp. 171, dismissed the Rule 10b–5 claims against some defendants because the Rule applies only to fraudulent misrepresentations made in connection with the purchase or sale of any security and because the sale of investment advisory services is not a security within the meaning of the Rule. Although the Court did not specifically consider the issue, its reasoning applies as well to plaintiffs' claim that a broker has a fiduciary duty to investigate investment advisers as well as securities before recommending them. Plaintiffs stipulated to the dismissal of their Rule 10b–5 claims in general, and that stipulation cannot reasonably be interpreted to except some such claims. If plaintiffs wanted to avoid the dismissal of those claims, they should have insisted on explicit language reserving those claims in the stipulation. Plaintiffs are therefore seeking to add a claim that is not currently part of this litigation.

No more than defendants were on notice that this claim was not dismissed pursuant to stipulation were they on notice that plaintiffs persisted in those dismissed claims. Defendants were not required to predict or assume that plaintiffs would exercise their right to amend the complaint in a certain way. When plaintiffs withdrew their initial motion to amend, they gave no indication that the withdrawal was temporary. Nor is the Court satisfied that defendants waived this objection to timeliness or avoided any prejudice by proceeding as if the breach-of-fiduciary-duty claims against the brokers were still in the lawsuit.

Adding this class claim at this time would prejudice the brokers by denying them a reasonable opportunity to respond. Liability for failure to investigate CIS is significantly different from liability for aiding and abetting the dissemination of fraudulent CIS promotional literature, and whether the former kind of liability can be determined on a class basis is significantly different from whether the latter kind can be so determined. Briefing the class certification motion put the brokers to significant expense, and they should not be put to additional expense because plaintiffs failed to think through their theories of liability before filing a motion for class certification. Plaintiffs' counsel may have had insufficient time to handle the motions for class certification and amendment simultaneously, but they themselves created that problem by agreeing to an unrealistic briefing schedule. Plaintiffs, not defendants, must bear the cost of that mistake. In their stipulation of June 17, 1977, plaintiffs did not reserve the right to make an untimely motion to amend their complaint.

Plaintiffs may assert the claims of breach of broker fiduciary duty in their individual actions. The brokers have alleged no prejudice in this regard, and the Court is not

---

1. The Court did not find it necessary to listen to the training tape which defendants objected to, so their motion to exclude this evidence is denied as moot.

convinced that the claims under Rule 10b–5 as well as under Rules of the NYSE and the NASD are legally insufficient. *See Wolfson v. Baker,* 444 F.Supp. 1124, 1132–1133 (M.D.Fla.1978). The Court does not decide the legal sufficiency of those claims at this time and only allows plaintiffs to amend their complaint in that respect.

■ The other proposed amendments are permissible. The new allegation that plaintiff Sullivan received, directly or indirectly through her family, copies of Performance Chart No. 2 from Witter does not prejudice Witter because Witter was aware of and responded to this contention, and the Court has an insufficient basis to conclude, as Witter urges, that plaintiffs are engaging in sham pleading. Most of the remaining changes are not substantive and do not merit individual discussion. In this Memorandum of Opinion, the Court will rely on the amended, rather than the original, complaint because it provides a current statement of plaintiffs' class claims.

## II. *MOTION FOR CLASS CERTIFICATION*

Plaintiffs have moved for certification of a plaintiff class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, which provides:

"(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Plaintiffs have abandoned any class claims involving oral representations about CIS, and their claims on behalf of the class are limited to basically six written representations. The Court will consider each of those six fraud claims in turn with respect to each of the six requirements of Rule 23(a) and (b)(3) and with respect to each of the three groups of defendants.

### A. *The CIS Defendants*

■ The CIS defendants (which the Court will refer to collectively as CIS for the sake of convenience) include CIS itself, Phoenix Investment Counsel of Boston, Inc., W Corporation, and thirteen individual defendants associated with those corporations. These defendants' liability or no to the class depends on basically the same considerations, so they will be treated as a group. Some of the individual defendants contend that the class should not be certified against them because plaintiffs have not produced sufficient evidence of liability, but none of them has filed a motion to dismiss or for summary judgment. A motion for class certification is not a proper vehicle to determine liability. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (hereinafter cited as *Eisen IV*).

### 1. *Performance Chart No. 1*

During at least some portions of the class period, CIS distributed through its own agents and various brokerage houses a

chart which purported to described the performance of "All Growth Oriented Accounts" relative to the performance of "Leading Market Averages" between March 1967 and March 1971, and which included several explanatory paragraphs. Plaintiffs allege that this Performance Chart No. 1 was false and fraudulent in various material respects.

### a. *Numerosity*

■ Rule 23(a)(1) establishes as a prerequisite of certification that "the class is so numerous that joinder of all members is impracticable * * *." Approximately 1541 investors opened accounts with CIS between April 1971 and May 1973. At least sixty percent of them probably saw Performance Chart No. 1 or No. 2, even under defendants' figures, and a class of 1000 clearly satisfies the numerosity requirement, as defendants concede.

### b. *Commonality*

■ A second requirement for certification is that "there are questions of law or fact common to the class * * *." Rule 23(a)(2). If there were no common questions of law or fact, those questions obviously could not predominate over questions affecting individual members, as Rule 23(b)(3) requires, so the Court will treat the commonality requirement of Rule 23(a)(2) in connection with the predominance requirement of Rule 23(b)(3), which subsumes it. 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1763, at 610 & n. 7 (1972); 3B Moore's *Federal Practice* ¶ 23.-06–1, at 23–301 (2d ed. 1977).

### c. *Typicality*

■ Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class * * *." The Court recently discussed the nature of the typicality requirement in *Wofford v. Safeway Stores, Inc.,* 78 F.R.D. 460, 488–489 (N.D.Cal.1978):

"the analysis [under Rule 23(a)(3)] must focus on a comparison of the representative plaintiffs' claims and defenses with those of the class. [Citation omitted.] Factual variations are not fatal to a proposed class when the claims arise out of the same remedial and legal theory. [Citation omitted.] Such variations do, however, raise two issues of typicality.

"First, * * * the common issues must occupy 'essentially the same degree of centrality' to the named plaintiffs' claim as to that of other class members. * * * And if it is predictable that 'a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative.'

* * * * * *

"[Second,] [f]actual variations may also reveal that different groups of class members have differing interests which, though not actually in conflict, will 'affect the nature of an effective presentation of their claims * * *.' "

The requirement of typicality also "seems intended to reinforce the adequacy requirement by ensuring that the named plaintiffs' interests are sufficiently aligned with those of class members to assure that they not only can but will press each such claim to a full and equal extent." *Id.,* at 475.

■ There will doubtless be some differences in emphasis in the claims of each representative plaintiff and each class member who received Performance Chart No. 1. Some may, for example, find it more difficult to establish reliance, while others may be relatively vulnerable to statute of limitations defenses. However, each representative plaintiff has an interest in establishing each element of a claim under the Investment Advisers Act, and their interests are "sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief * * *." *Id.,* at 489; *see Hurwitz v. R. B. Jones Corp.,* 76 F.R.D. 149, 157–158 (W.D.Mo.1977) (typicality despite alleged variations in reliance). Though not identical, the representative plaintiffs' claims are typical.

The Court is satisfied that the claims of clients who saw Performance Chart No. 1 and had as their investment objective maximum capital growth are typical of the claims of clients who saw Performance Chart No. 1 and had other investment objectives even though the Chart purported to depict only growth-oriented accounts. The latter group might well have assumed that if CIS outperformed the market in one type of investment, it outperformed it in others, so fraudulent depiction of performance with one type of investment might well have affected investors with somewhat different investment goals in the same general way. Questions of materiality and reliance (*see* pp. 259–261 and 261–262, *infra*) are likely to be typical for each type of investor. Similarly, the claims of relatively sophisticated investors are typical enough of the claims of relatively unsophisticated investors to satisfy Rule 23(a)(3).

### d. *Adequacy*

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." "The requirement of adequate representation has two elements. First, the named plaintiffs' counsel must be qualified, experienced, and generally able to conduct the litigation. * * * [Second,] there must be no evidence of collusion or of conflicting interests between the named plaintiffs and members of the class. [Citation omitted.] Beyond this, a named plaintiff must display some minimal level of interest in the action, familiarity with the practices challenged, and ability to assist in decision making as to the conduct of the litigation." *Wofford v. Safeway Stores, Inc., supra,* 78 F.R.D., at 486–487.

With respect to the qualifications of the class counsel, "[c]ourts may take into account any prior failure to proceed in the best interests of the putative class in this litigation, as well as counsel's general qualifications." *Id.,* at 486. Counsel's failure to move to amend the complaint in a timely fashion before class certification concerns the Court, but overall, the Court is satisfied that counsel will be diligent and competent in their representation of any class.

The Court's major concern about counsel involves their role in a parallel securities fraud case against CIS in the District of Maryland, *Lion v. CIS,* Civ. No. M–76–493. Counsel for the proposed class are of counsel in the *Lion* case. The possibility that assets and insurance of the defendants who may have committed fraud against the plaintiffs will be insufficient to satisfy an alleged liability to the class of over $20 million is great enough to influence litigation strategy. The Lions' interest in collecting some money from CIS before this class litigation is concluded is obvious, and the diminution of the defendants' assets by payment to the Lions would equally obviously affect the interests of this class. Because this putative class and the Lions have conflicting interests in the course of each litigation, counsel cannot represent both. ABA Code of Professional Responsibility Disciplinary Rule 5–105 and Ethical Considerations 5–14 through 5–16. The Court has no reason to believe that counsel's representation in this lawsuit has yet been influenced by their responsibilities to the Lions, but counsel must submit an affidavit within five days of the date of this order certifying that they have completely withdrawn from further representation of the Lions if this class action is going to proceed. The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel. *See Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832 & n. 9 (3 Cir. 1973).

The fact that counsel have not tried to press claims against CIS which they believe (and justifiably so) are unsuitable for class treatment does not make them inadequate. To the contrary, that is the proper course for them to take. *See* p. 265, *infra.*

Defendants have not seriously challenged the adequacy of the representative plaintiffs.

#### e. *Predominance*

In order to allow an action to proceed as a class action under Rule 23(b)(3), the Court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members * * *."

 Defendants recognize that common questions generally predominate in securities fraud cases involving standardized written representations to a class of investors. *E. g., Blackie v. Barrack,* 524 F.2d 891, 902–903 (9 Cir. 1975) (commonality); 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1781, at 87–97 & n. 33 (1972). CIS also concedes that the issue of scienter—whether CIS knew that its representations were materially misleading or recklessly disregarded their misleading nature [2]—is amenable to class treatment. CIS insists, however, that proof of materiality, reliance, and damages will vary for each member of the class with enough frequency and to such a degree that these questions affecting individual members predominate over common questions. The Court cannot accept these arguments.

#### i. *Materiality*

 The standard of materiality in Rule 14a–9 is as follows: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). That is also the standard for the materiality of misrepresentations and omissions under § 206 of the Investment Advisers Act. Materiality depends on the total mix of information available to the investor because materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ibid.* (footnote omitted).

Performance Chart No. 1 is surely not a material part of the total mix of information if it is not part of that mix. Each class member must establish receipt of the Chart as a condition of recovery. Although the parties dispute what percentage of class members did not receive a charge, even plaintiffs concede that at least 10 percent and perhaps as many as 25 percent did not receive any performance chart. To allow a substantial number of class members who never received Performance Chart No. 1 to recover damages because of its fraudulent nature would change substantive rules of liability because this is a class action, and Rule 23 cannot be used in that way. 28 U.S.C. § 2072; *Blackie v. Barrack, supra,* 524 F.2d at 908. Proof of receipt is an aspect of materiality which presents individual questions, but the common questions of materiality still predominate.

 Defendants argue that because the total mix of information varied materially from CIS client to CIS client depending on the oral representations made by CIS representatives and brokers and on other sources of information, individual questions of materiality predominate. Although written representations are more likely to be suited for class treatment than oral representations, which often tend to vary materially, *see, e. g., Clark v. Watchie,* 513 F.2d 994, 1000 n. 13 (9 Cir. 1975); *In re Scientific Control Corp. Securities Lit.,* 71 F.R.D. 491, 500 (S.D.N.Y.1976), the mere fact that plaintiffs' claims are based on written representations does not guarantee class treatment. "[I]f the writings contain material variations, emanate from several sources, or do not actually reach the subject investors, they are no more valid a basis for a class action than dissimilar oral representations." *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 482 F.2d 880, 882 (5

---

2. It is now settled in this Circuit that reckless conduct satisfies the scienter requirement of Rule 10b–5 actions. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9 Cir. 1978). That reasoning applies with equal force to actions under the Investment Advisers Act. Plaintiffs' allegations of reckless as well as intentional conduct therefore state a claim upon which relief may be granted. *Cf. Sullivan v. Chase Investment Services of Boston, Inc., supra,* 434 F.Supp. at 184 n. 18.

Cir. 1973). In addition, oral representations dealing with the same subject as the written representations may vary the total mix of information to such a degree that individual questions concerning the total mix predominate. "[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Advisory Committee Note on 1966 Amendments of Rule 23, 39 F.R.D. 98, 103 (1966). Individual issues of materiality do not necessarily preclude predominance, and the Court must make some assessment of the probability that variations in the total mix of information are frequent and substantial in order to determine whether common questions of materiality predominate. *See Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 693 n. 10, 695 (9 Cir. 1977) (isolated instances of nonreliance do not defeat certification).

The evidentiary material submitted to the Court suggests that individual variations in the total mix of information available to CIS investors do not destroy predominance. In general, the past performance of an investment adviser is a material fact to its clients, and the existence of information about other subjects relevant to the selection of an investment adviser is unlikely to make its past performance immaterial to the reasonable investor. Whether information about past performance in general is material is a predominating common question.

The issue then becomes whether clients of CIS had significant other sources of information about past performance that conflicted with or modified Performance Chart No. 1. The availability of other sources of information does not defeat predominance unless those sources modified or explained or corrected the allegedly misleading representations in the Chart. The probability that oral or other written representations modified or explained the Chart is higher in the case of omissions than misrepresentations because correction of an omission does not require contradiction of a specific statement, something salesmen are unwilling to do, and plaintiffs insist (not always correctly) that omissions and not misrepresentations made the Chart misleading. Nevertheless, the Court concludes that other representations did not significantly alter the total mix of information about past performance of CIS very often.

One potentially significant source of other information about past performance is the individual CIS or broker representative with whom a class member dealt. Contrary to defendants' suggestion, oral representations by those representatives concerning the performance of specific selected CIS-managed portfolios do not significantly affect the alleged representations concerning the average overall performance of CIS growth-oriented accounts between 1967 and 1971 in Performance Chart No. 1. Representatives of defendants do not appear to have made oral representations about past performance over this four-year period which differed materially from those in the Chart. In addition, there is some evidence that the sales pitches of salesmen were standardized at least to a limited degree, and that evidence further decreases the likelihood of predominating individual questions. *See In re Home-Stake Production Co. Securities Lit.,* 76 F.R.D. 351, 369 n. 11 (N.D.Okl.1977).

A second potentially significant source of other information about past performance is the other two performance charts distributed during the class period. Those charts contain different information about CIS's past performance, and plaintiffs implicitly concede that the information in Performance Chart No. 3 is accurately and fairly presented. However, there is no substantial evidence that a significant number of investors received more than one performance chart. Even if a significant number of investors received Performance Charts No. 2 or 3 in addition to Performance Chart No. 1, the materiality of the first chart would present predominating common ques-

tions for that group.[3] Another table summarizing performance of CIS-managed portfolios for various periods between June 1967 and December 1970 was apparently shown to some CIS clients. Doc. 8132. There is no reason to believe that this table was distributed on a systematic basis or in significant numbers, and the existence of a few cases which present individual issues of materiality does not make those individual questions predominate.

Finally, some clients and prospective clients did some research on their own concerning the relative performance of CIS and other funds and indexes, but there is no reason to believe that this was done on any widespread basis.

 Performance Chart No. 1 contains representations whose materiality can be determined on a class-wide basis because they were not significantly modified, elaborated, or explained by a variety of other oral and written representations. The total mix of information about past performance was relatively constant. Accordingly, the Court finds that common questions of materiality—"a mixed question of law and fact," *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 450, 96 S.Ct. at 2132–2133—predominate over individual questions.

ii. *Reliance*

 In order to recover damages, a plaintiff in an action under the Investment Advisers Act must prove that he relied on the material misinformation which the defendant fraudulently disseminated. *Abrahamson v. Fleschner,* 568 F.2d 862, 878 (2 Cir. 1977); *see Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (reliance requirement in 10b–5 actions). Common issues of reliance predominate over the individual issues.

**3.** Whether clients who saw, for example, both the first and second charts have claims typical of those who saw only the first chart is a separate question, and the Court concludes that they are typical. *See* pp. 266–267 & n. 10, *infra.*

**4.** Reliance is also inferred from "a deception inflating the price of stock traded on the open market." *Blackie v. Barrack, supra,* 524 F.2d

This finding of predominance is based in part on the presumption of reliance by an investor on a material misrepresentation or omission of a material fact. The Court has already found that the issue of materiality presents predominating common questions. See pp. 259–261, *supra.* The law is settled that in cases "involving primarily a failure to disclose [material information], positive proof of reliance is not a prerequisite to recovery" because reliance is inferred from the materiality of the misleading omission. *Id.,* at 153, 92 S.Ct. at 1472, Note, *The Reliance Requirement in Private Actions under SEC Rule 10b–5,* 88 Harv.L. Rev. 584, 590–592 (1975) (hereinafter cited as Harvard Note).[4] Because some of the requirements in Performance Chart No. 1 include misrepresentations and not just omissions of allegedly material facts, the Court must decide whether reliance can be presumed from the materiality of a misrepresentation.

 This presumption is proper. If a misrepresentation is material to a reasonable investor, a reasonable investor would rely on it, and the law presumes that investors are reasonable until proven otherwise. As the Court of Appeals said in *Blackie v. Barrack, supra,* 524 F.2d at 906 n. 22, the result in *Affiliated Ute Citizens* "turns on the assumption that the particular investor is more likely to act like the reasonable investor than not." Furthermore, the Investment Advisers Act is intended to promote accurate as well as full disclosure of material facts by investment advisers with a fiduciary duty to their clients. *Sullivan v. Chase Investment Services of Boston, Inc., supra,* 434 F.Supp. at 180 and 183; *see SEC v. Capital Gains Research Bureau, Inc.,* 375

at 906; Harvard Note, *supra,* 88 Harv.L.Rev. at 592–596. This is not an open-market case in the sense of *Blackie v. Barrack* because plaintiffs make no contention that the effect which CIS's allegedly fraudulent brochures had on other clients and prospective clients made its services significantly more expensive, although they may have had some incidental effect.

U.S. 180, 190–191, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Like Rule 10b–5, the Investment Advisers Act must "be liberally construed to effectuate its remedial purposes, and * * * that purpose may be served only by allowing an overinclusive recovery to a defrauded class if the unavailability of the class device renders the alternative a grossly underinclusive recovery." *Blackie v. Barrack, supra,* 524 F.2d at 906 n. 22. Finally, " '[t]he categories of "omission" and "misrepresentation" are not mutually exclusive,' " *Cameron v. E. M. Adams & Co.,* 547 F.2d 473, 477 n. 3 (9 Cir. 1976), *quoting Little v. First California Co.,* 532 F.2d 1302, 1304 n. 4 (9 Cir. 1976), and the ambiguity of the dividing line (illustrated in this case) makes it appropriate to treat both kinds of misinformation the same.

One justification for a presumption of reliance in omissions cases involves "the difficulty of proving reliance on the negative." Harvard Note, *supra,* 88 Harv.L. Rev. at 590; *Blackie v. Barrack, supra,* 524 F.2d at 908. Although proof of reliance on a representation that was made may be easier than proof of reliance on a representation that was not made, the burden of proof in the former case would be carried by a simple affirmation of reliance. A presumption of reliance from the materiality of a misrepresentation makes sense because it "is more straightforward than requiring an empty pleading and proof, or playing word games with nondisclosure." 3 A. Bromberg, *Securities Law* § 8.6(2), at 212 (1971). *Contra,* Harvard Note, *supra,* 88 Harv.L.Rev. at 589; *cf. Holdsworth v. Strong,* 545 F.2d 687, 695 (10 Cir. 1976) (*en banc*), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). Reliance must still be proved, and the presumption from materiality simply establishes another means to prove it.

This presumption of reliance does not necessarily mean that common issues of reliance predominate because the presumption is rebuttable. *Blackie v. Barrack, supra,* 524 F.2d at 906 n. 22. If it seems likely that a substantial number of investors did not rely despite the presumption, the individual questions would predominate. *See Arthur Young & Co. v. United States District Court, supra,* 549 F.2d at 683 n. 10 and 695. However, there is no reason to believe that a significant number of CIS clients failed to act like reasonable clients who would rely on material misrepresentations and omissions. Defendants place great emphasis on evidence suggesting that some clients, including some named plaintiffs, relied and even relied primarily on other representations concerning CIS in deciding to entrust their securities to CIS,[5] but reliance on certain representations does not disprove or preclude reliance on others.[6] *See Hurwitz v. R. B. Jones Corp., supra,* 76 F.R.D. at 169–170 & n. 34 (predominance despite some variations in reliance).

The Court therefore finds that common questions of reliance predominate over individual questions of reliance.

iii. *Damages*

Defendants assert that the calculation of damages necessarily presents individual questions which predominate over common questions. The Court disagrees.

The Court is inclined to think that damages should be calculated as follows. Until September 1972, CIS divided its clients into three categories: those seeking maximum capital growth, those seeking moderate capital growth and reasonable income, and those seeking maximum income. In September 1972, CIS changed the designations of these three groups, but the Court

---

**5.** Many respondents to the SEC questionnaire indicated that they chose CIS primarily because of their brokers' recommendations.

**6.** Plaintiffs may have to establish due diligence, that their reliance was not only actual but justifiable. *See Dupuy v. Dupuy,* 551 F.2d 1005, 1013–1016 (5 Cir. 1977). There is no substantial evidence that any significant number of class members relied on Performance Chart No. 1 " 'in disregard of a risk known to [them] or so obvious that [they] must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' " *Id.,* at 1020, *quoting* W. Prosser, *Handbook of the Law of Torts* § 34, at 185 (4th ed. 1971).

does not know whether that change had any substantive effect. For each of those groups, it should be possible to construct a representative index consisting of securities suitable for each type of investor. The measure of damages would be the difference between the rise or decline of the client's CIS portfolio during the damage period[7] and the rise or decline of the index for the group to which the client belonged during that time.[8] This calculation would be a relatively simple task because records for each class member still exist and because calculation of the dollar value of a portfolio at the beginning and end of the damage period for an investor would be relatively straightforward.

This approach seems preferable to plaintiffs' proposal, which would give each client the value of the decline, if any, in the value of his portfolio during the damage period. This formula seems to make CIS liable for losses due not to its alleged fraudulent conduct but to a general decline in the stock market, and the compensatory purpose of the implied cause of action under the Investment Advisers Act has led courts to limit a client's recovery to actual damages. *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 49 & n. 22 (2 Cir. 1978); see *Abrahamson v. Fleschner, supra,* 568 F.2d at 878–879; *cf. Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9 Cir. 1976) (Sneed, J., concurring).

*Gottreich v. San Francisco Investment Corp.,* 552 F.2d 866, 867 (9 Cir. 1977), is distinguishable. The plaintiffs in *Gottreich* alleged that they would have stayed out of the stock market if the defendants had not fraudulently persuaded them that securities were not risky, so the market decline was precisely the injury which they sought to avoid, which the defendants' conduct exposed them to, and for which they were entitled to recover. Here, plaintiffs allege they were fraudulently induced to use a different investment adviser than they otherwise would have, and although the Court can assume (at least in the absence of proof to the contrary) that plaintiffs' portfolios would have done no worse than indexes of securities of risk and return consistent with plaintiffs' investment objectives, it cannot assume that they would have done better than those indexes.

Defendants' preferred damage formula, return of the investment advisory fee, seems equally inappropriate. If because of CIS's fraud its clients entrusted their money to CIS instead of another investment adviser, they were cheated of the opportunity to put their money in the hands of someone who might have managed it better. Although the damages for which a defendant who commits securities fraud is liable may be his profits if they are greater than the victim's damages, *Nelson v. Serwold,* 576 F.2d 1332, 1339 (9 Cir. 1978), the defendant is liable for the victim's actual damages if they exceed his profits. It may well be that CIS's liability may greatly exceed its profits during the class period,[9] but in those circumstances, "the proper measure of damages is what the [clients] lost as a result of the defendant's wrong, not what the defendant gained." *Green v. Occidental Petroleum Corp., supra,* 541 F.2d at 1341–1342 (Sneed, J., concurring).

 The Court's selection of a damage formula is only tentative because the parties have focused on class versus individual measures of damages and not on the relative merits of different class damage for-

---

7. The Court uses the term damage period to mean the period from when the class member became a client of CIS until that client no longer justifiably relied on the material fraud which induced him to become a client or until he terminated his CIS account or assumed personal control of that account.

8. Each client's damages would be calculated on the basis of the client group to which the client belonged even if the client claims that CIS misclassified him. Such a claim is a suitability claim which plaintiffs concede is unsuitable for class treatment, and damages due to unsuitability are not causally connected with fraudulent representations about CIS's past performance.

9. According to defendants, CIS took in about $2 million in investment advisory fees during the period plaintiffs allege they suffered more than $20 million worth of damages.

mulas and because none of the parties has considered the damage formula tentatively preferred by the Court. The Court itself has not considered whether under its formula plaintiffs would also be entitled to return of investment advisory fees and whether plaintiffs are entitled to prejudgment interest,*see Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 50. What is important for purposes of this motion is that the potentially acceptable damage formulas all seem to be relatively simple to apply, so common questions of damages predominate over individual questions of damages. Under these circumstances where damages are " 'capable of mathematical or formula calculation,' " *Windham v. American Brands, Inc.,* 565 F.2d 59, 68 (4 Cir. 1977) (*en banc*), *cert denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978), *quoting* Practicing Law Institute, *Current Problems in Federal Civil Practice* 491 (1975), common questions of damages predominate. *See Blackie v. Barrack, supra,* 524 F.2d at 905.

iv. *Statute of Limitations Defenses*

■ The only defense which defendants argue makes individual questions predominate over common ones is a statute of limitations defense. This suit was filed August 23, 1976. Defendants contend that a significant number of CIS clients knew or should have known before August 23, 1973, that CIS had defrauded them and that the claims of those clients are barred by the apparently applicable three-year statute of limitations, Cal.Code Civ.Proc. § 338(4). *Sackett v. Beaman,* 399 F.2d 884, 890 (9 Cir. 1968); *Smith v. Guaranty Service Corp.,* 51 F.R.D. 289, 294–295 (N.D.Cal.1970). "[T]he time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme." *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2 Cir. 1975).

As the Court of Appeals said in *Cameron v. E. M. Adams & Co., supra,* 547 F.2d at 478, *quoting Williams v. Sinclair,* 529 F.2d 1383, 1388 (9 Cir. 1975):

" 'The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones. Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases.' "

The evidence before the Court does not suggest that a significant number of class members knew or should have known that CIS's representations concerning past performance in Performance Chart No. 1 were fraudulent. CIS never distributed on a systematic basis information which described any more accurately or completely than that Chart the performance of its accounts between March 1967 and March 1971. Many CIS clients complained to CIS when their portfolios began to decline in value, and some, including plaintiff Shapiro, attributed that decline to CIS's incompetence or worse. But these complaints could well be only the kind of accusations that disgruntled investors frequently make when their broker or investment adviser does not do as well as the client would like, and there is no indication that these CIS clients based their accusations on any specific facts other than a decline in the value of their securities. Proof that these clients recognized that portfolios managed by CIS declined more than the stock market as a whole would probably not carry defendants' burden to prove that plaintiffs knew or should have known that CIS acted fraudulently and not merely incompetently or unluckily before August 1973.

■ Defendants also contend that plaintiffs Shapiro and Batchelor's claims are barred by the statute of limitations because they discovered the fraud in 1972. Defendants have not moved for summary judgment on this issue, and a preliminary factual determination of the merits of a claim in connection with the certification of a class is improper. *Eisen IV, supra,* 417 U.S. at

177–178, 94 S.Ct. 2140. If an investment adviser could defeat class certification simply by disclosing evidence that suggests a valid defense against a representative plaintiff, "it would follow that no class action could stand until the plaintiff proved every material element of his individual claim" and rebutted every arguable defense—an approach that clearly violates Rule 23. *Mersay v. First Republic Corp. of America,* 43 F.R.D. 465, 469 (S.D.N.Y.1968).

As in *Cameron v. E. M. Adams & Co., supra,* 547 F.2d at 478, "even if there exists [*sic*] questions of individual compliance with the [California] statute of limitations, they are not sufficient, on balance, to negate the predominance of the common issues."

### f. Superiority

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The Court finds that the superiority requirement is satisfied.

Other available methods to resolve the disputes between CIS and its former clients do not make a class action based on some fraud claims inferior. It seems clear that some clients of CIS believe that CIS committed frauds other than those involved in the class aspect of this litigation. In particular, some clients, including the representative plaintiffs in this case, believe that CIS invested in securities that were unsuitable for them. CIS protests that "the named Plaintiffs should not be allowed to waive the very claims on which the class has its best practical chances of actual recovery," and CIS is presumably in a very good position to know whether and how it defrauded its former clients. But the fact that CIS committed frauds unsuitable for class treatment as well as frauds suitable for class treatment does not mean that certification of classes in the latter situation is improper. Clients who have claims not raised in this class action because the claims are unsuitable for class treatment can bring those claims on an individual basis, and *res*

*judicata* will not bar those claims because absent class members had no opportunity to litigate those issues in this lawsuit.

What defendants have characterized as "splitting" causes of action is perfectly appropriate under Rule 23. It is not uncommon for defendants to engage in a course of conduct which gives rise to a variety of claims, some amenable to class treatment, others not. Those claims that are amenable should be prosecuted as class actions in order to realize the savings of resources of courts and parties that Rule 23 is designed to facilitate. *But see City of San Jose v. Superior Court,* 12 Cal.3d 447, 115 Cal.Rptr. 797, 808–809, 525 P.2d 701 (1974) (California law). Class representatives must press all claims which can be prosecuted on a class basis, but they need not and should not press for certification of claims that are unsuitable for class treatment.

When class members have both individual claims and class claims, the latter should be prosecuted on a class basis unless the individual and class claims are difficult to separate or unless the class members have an interest in controlling the prosecution of all claims. *See Elster v. Alexander,* 76 F.R.D. 440, 443 (N.D.Ga.1977) (discretion of court). Here, a fraud claim based on the first Chart is easily separated from a non-suitability claim, and there is no apparent interest of any significant number of absent members in individually controlling the fraud claim based on the first Chart. Nor does the *Lion* litigation in the District of Maryland, the only other pending or terminated lawsuit against CIS based on the allegedly fraudulent nature of that Chart, indicate that class prosecution of this fraud claim is inappropriate or that concentrating the litigation of this claim against CIS in this forum is undesirable.

The fact that ten other lawsuits have been brought against CIS has uncertain significance. It is not clear how large an incentive each former client has to sue under the damage formula preferred by the Court, although the average recovery of

class members is several thousands of dollars under plaintiffs' proposed formula. Moreover, a potentially large recovery is not an adequate incentive to victims of fraud to file suit if the costs of litigation equal or exceed the amount of potential recovery discounted by the probability of not prevailing. Building a case against CIS is an expensive and time-consuming project, and the small number of lawsuits may reflect that fact. Ignorance of a possible fraud may have contributed to the paucity of individual actions—an article on the inside pages of the Wall Street Journal about the SEC consent decree against CIS is hardly the significant publicity that defendants call it.

 Defendants insist that this class action will be unmanageable. The Court has already indicated that relatively few class members will probably be unable to prove materiality or reliance. Of course, this class action could still be unmanageable if many individual trials were necessary to identify those few class members who could not reasonably or did not consider the representations in Performance Chart No. 1 material. Individual proof of receipt of Performance Chart No. 1 is necessary but practicable. The Court will require each class member who seeks to participate in any class recovery to submit some kind of written notarized statement detailing the circumstances in which he received that Chart and describing other information that he had about the performance of CIS. Defendants will then be permitted to conduct limited discovery of each member who submits a claim. This procedure should be able to weed out many nonmeritorious claims and establish a basis for settlement of most others. The probability that the Court will have to try dozens or hundreds of individual cases to determine materiality and reliance is too slight to justify a finding that a class action is unmanageable. *See Blackie v. Barrack, supra,* 524 F.2d at 906 n. 22 (means of managing complex class actions). Noncertification is proper only if the litigation is unmanageable as a class action, not if it is difficult to manage.

### 2. *Auditing*

Plaintiffs seek to represent a class of CIS clients who relied on the allegedly material misrepresentation in Performance Chart No. 1 that the data displayed in it had "been audited by Certified Public Accountants"—a representation that CIS concedes to be false.

 Defendants have not specifically challenged certification of a class based on this claim, and the Court believes that certification is proper for essentially the same reasons that certification of a class based on the representations concerning past performance in the Chart is appropriate. No substantial evidence before the Court indicates that significant variations among clients and prospective clients of CIS concerning materiality of or reliance on that representation exist.

### 3. *Performance Chart No. 2*

Beginning during the spring of 1972, CIS distributed through its agents and through various brokerage houses another performance chart which the parties generally call Performance Chart No. 2 and which is attached as Exhibit B to plaintiffs' original complaint. Plaintiffs concede that "[i]n comparison with Performance Chart No. 1, Performance Chart No. 2 does not appear as egregious in terms of its misrepresentation of the true facts."

 For the same reason that clients and prospective clients of CIS who received Performance Chart No. 1 belong to a class certifiable under Rule 23, the Court will certify a class of clients and prospective clients who received a copy of Performance Chart No. 2.

 Although there are differences between Performance Charts Nos. 1 and 2, recipients of only the first Chart need not be placed in a subclass separate from those who received only the second Chart. The second Chart was developed from the first, and claims involving an interrelated course of conduct by a defendant can be certified together in one class action. *Blackie v.*

*Barrack, supra,* 524 F.2d at 903–904 & n. 19; *In re Home-Stake Production Co. Securities Lit., supra,* 76 F.R.D. at 369.[10] The representative plaintiffs' claim need be only typical of, not identical with, those of class members. To paraphrase *Wofford v. Safeway Stores, Inc., supra,* 78 F.R.D. at 478, the named plaintiffs' claims with respect to the first Chart charge fraud based on a practice or course of business not special or unique to themselves, and recipients of the second Chart were similarly victimized by the same practice and course of business. *See* § 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b–6(2) (prohibition of "practice, or course of business which operates as a fraud or deceit upon any client or prospective client * * *"); *Blackie v. Barrack, supra,* 524 F.2d at 903 n. 19. Accordingly, plaintiff Batchelor, who received only the first Chart, can represent class members who received the second Chart, and plaintiffs Sullivan and Shapiro, who received only the second Chart, can represent those who received the first.

### 4. *Tailoring*

In a brochure distributed to some clients and prospective clients of CIS, CIS represented that "[a]n investment adviser should provide private, impartial investment advice tailored to his client's personal requirements and best interests"; that "[o]ur job is to tailor for you a personal and professionally managed investment program designed to help you attain whichever one of the three basic investment objectives you select"; and that "[w]e will instruct your brokerage firm to purchase for your CIS account the individual securities which we believe will best serve the investment objec-

tive you have selected." Plaintiffs allege that these representations are false and fraudulent.

Plaintiffs concede that nonsuitability claims are unsuited for class treatment, so this claim, which is essentially a nonsuitability claim, cannot be maintained on a class basis. Whether the representations about tailoring in the brochure were false with respect to a particular client depends on whether CIS in fact tailored its management of his portfolio to his individual needs and investment objectives. The nature of a client's investment objectives, the degree to which CIS tailored its management to those objectives, and the extent to which securities purchased by CIS were unsuited to those objectives present predominating individual questions of fact. Moreover, evidence before the Court, indicates that CIS representatives and brokers made oral representations concerning the management of individual accounts which may have significantly modified the message in the brochures and the client's understanding of it.

In their amended complaint, plaintiffs allege in connection with the class claims that CIS represented in the brochure that it would manage the accounts by "prudent investing in good quality securities, rather than through trading or speculation." Plaintiffs do not, however, allege that this representation is false, and in any case, this claim presents predominating individual questions of fact for basically the same reasons that the nonsuitability claim does.

■■■ Accordingly, the Court will not certify a class or subclass asserting these claims.

**10.** The Court recognizes that these cases involve fraud on the market (*see* n. 4) where the related documents affect the named plaintiff even if he did not see them because other investors' reliance on them affects the value of the named plaintiff's security. The interrelationship and overlap between the two Performance Charts does, however, give recipients of one Chart sufficient interest in establishing fraud with respect to the other Chart to enable him to represent recipients of either Chart. *Cf. Wofford v. Safeway Stores, Inc., supra,* at 482–483 (under the circumstances, employees

in one job classification can represent employees in other job classifications in Title VII suit) and 47 (under the circumstances, employees in one minority group can represent employees of other minority groups). Whether a named plaintiff with a claim based only on a Performance Chart could prosecute a class claim based on representations concerning suitability (*see* "4. Tailoring," *infra*) presents different questions. *See Amswiss International Corp. v. Heublein, Inc.,* 69 F.R.D. 663, 667 (N.D.Ga.1975).

### 5. Continuous Review

The same brochure also represented that a client's "account is continuously reviewed to ensure that your portfolio reflects the current investment policy of John P. Chase, Inc."; and that "[c]ontinuous and constant advice is, in effect, a daily reappraisal of all the factors affecting one's portfolio and its objectives." Plaintiffs allege that this representation is materially false because CIS reviewed each portfolio only once a month or so and because it reviewed on a daily basis only the list of securities approved for holding in individual accounts, so that CIS would make changes in individual portfolios to reflect its current investment policy only on a delayed basis.

This issue does not present predominating common questions of fact. During its investigation of CIS, the Securities and Exchange Commission ("SEC") sent questionnaires to CIS clients. CIS compiled a summary of the responses whose general accuracy (at least with respect to the issue of frequency of review) plaintiffs do not seriously challenge. It is not clear what the response rate of CIS clients to this questionnaire was, but because disgruntled clients are more likely to respond to the questionnaire and perhaps more prone to exaggerate their dissatisfaction, the results of the questionnaire are more likely to be skewed in favor of plaintiffs' position than defendants'.

Question No. 3(d) asked the respondent to describe his understanding at the time he retained CIS of CIS's investment management service with respect to the frequency with which his individual account would be reviewed and the basis for his understanding. About forty percent of the respondents seemed to have an accurate understanding of the frequency of review, and the percentage could be higher depending on the interpretation of often ambiguous answers. Doc. 9134. These responses indicate a wide variety of understanding about the frequency of review and suggest that individual questions predominate. This conclusion is not surprising because this subject is one which prospective clients might well have discussed with CIS representatives or their broker and because oral representations may have modified their understanding of the representations in the brochure. The likelihood of elaboration of those written representations is increased by their ambiguity. The brochure does not say that continuous and constant advice is a daily reappraisal of each portfolio; it says, "Continuous and constant advice is, in effect, a daily reappraisal of *all the factors affecting* one's portfolio and its objectives." (Emphasis added.) These considerations apply with equal force both to plaintiffs' contention that the brochure misleadingly failed to disclose that CIS did not review individual accounts when CIS changed its research position on individual securities and to their contention that the brochure misrepresented the frequency of review of the individual portfolio in general.[11]

■ For these reasons, a class based on this claim would not satisfy the requirements of Rule 23.

### 6. Investment Counsel

Finally, plaintiffs allege that the representation in the brochure that CIS was an investment counsel was materially false and fraudulent because §§ 208(c) and 202(a)(13) of the Investment Advisers Act, 15 U.S.C. §§ 80b–8(c) and 80b–2(a)(13), limit the use of that term to those whose business consists in substantial part of giving "continuous advice as to the investment of funds on the basis of the individual needs of each client."

■ Assuming that most CIS clients and prospective clients understood this term in its technical sense, the representation

11. The letter sent on October 18, 1972, to all or most CIS clients, which said that individual portfolios were reviewed every 20–21 working days or approximately once a month, would not create predominating individual questions concerning statute of limitations defenses because whether a client could reasonably have relied on the representations in the brochure about frequency of review after receiving this letter is a question common to all or most of the class.

amounts to a nonsuitability claim that is not amenable to class treatment for the reasons discussed at p. 267, *supra*.

#### 7. *State Claims*

■ Plaintiffs also seek to assert various fraud claims under California law against CIS. The claims under federal securities law that are suitable for class treatment are suitable for class treatment under state law as well. Indeed, the Court of Appeals for this Circuit has suggested that failure to permit a class action based on state claims which are pendent to federal class claims is an abuse of discretion. *Cameron v. E. M. Adams & Co., supra*, 547 F.2d at 478–479.

■ The only separate issue relevant to certifiability involves the definition of the class. Plaintiffs seek to represent all CIS clients who were California residents at the time they entered into their initial agreements with CIS or were otherwise entitled to the protection of California law at that time because of their contracts with California. Analysis of these California connections under the principles of *Bernhard v. Harrah's Club*, 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (1976), and *Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 109–111, 522 P.2d 666 (1975), would involve the Court in complex individualized determinations of choice of law. Accordingly, the subclass asserting claims under California law will be limited to those who were California residents at the time the fraudulent representations were made because residence provides a simple standard.

■ This definition of the California subclass raises a problem with respect to plaintiff Shapiro's ability to represent it because he was apparently not a California resident at the time of the alleged fraud. The justification for the requirement that a named plaintiff be a member of the class he seeks to represent is unclear. *Wofford v. Safeway Stores, Inc., supra*, 78 F.R.D. at 475–476. Shapiro clearly has a basis to raise a claim under California law, and this Court has pendent jurisdiction over it. So the critical question involves compli-

ance with Rule 23. Under these unique circumstances, the Court concludes that uncertainty about California law's protection of Shapiro is like uncertainty about any other element of a named plaintiff's claim. It is conceivable that under California's complicated choice of law standards, the victim of a tort may be able to invoke California law against a tortfeasor who is a resident of California even if the tort occurred elsewhere and the victim had no other connection with this state. If Shapiro makes this showing, he will recover on the same basis as a California resident (a few of whom may conceivably not have the protection of California law themselves). Accordingly, the Court concludes that Shapiro is a proper and adequate representative of the California subclass.

■ Defendants' argument that class certification is improper unless the named plaintiffs raise every possible claim under state law that class members may have is frivolous. *See* p. 265, *supra*. As plaintiffs correctly state:

> "The extent to which defendants' argument reduces to absurdity can be gauged from the ludicrous Witter contention that plaintiffs are inadequate representatives for not presenting pendent claims under the law of every state in which a class member lives. * * * The presentation of such multifarious pendent claims would almost certainly destroy predominance and would probably render the class action unmanageable as well. * * * Yet, given that every state makes it a tort under state law to commit a fraud, Witter's argument would bar any nationwide class action for violation of Rule 10b–5, since conduct violative of Rule 10b–5 can always be the basis for claims under the laws of the various individual class members' states." Closing Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Certification of Class, at 38–39 (filed December 14, 1977) (citations omitted).

#### B. *The Attorney Defendants*

Plaintiffs allege that the attorney defendants, Sullivan & Worcester, John Hand,

and Thomas R. B. Wardell, participated in the drafting of CIS promotional literature including Performance Charts Nos. 1 and 2 and that they knew the literature was false. For the same reasons that certification of a class based on these Charts against CIS is appropriate, the certification of a class against the attorney defendants is appropriate.

 The attorney defendants strenuously argue that certification is improper because evidence of their fraud is weak or nonexistent. A determination of the merits of a claim in connection with class certification is clearly improper, *Eisen IV, supra,* 417 U.S. at 177–178, 94 S.Ct. 2140, and if the material facts of the claim against the attorney defendants could be established beyond genuine dispute, they presumably would have filed a motion for summary judgment. The question is not whether the plaintiffs will win or lose against the attorney defendants, but whether the outcome depends on common questions of fact which predominate over individual ones.

## C. *The Broker Defendants*

 The broker defendants, Witter, Hutton, Mitchum, and the individuals affiliated with them, are liable to their clients if they distributed promotional brochures prepared by CIS to their clients which the brokers knew were materially misleading or whose materially misleading nature they recklessly disregarded and if their clients were damaged as a result of those brochures. *See Rolf v. Blyth, Eastman Dillon & Co., Inc., supra,* 570 F.2d at 47–48 (elements of aiding and abetting liability). It is not enough under this aiding and abetting theory that the brokers failed to carry out a fiduciary duty to investigate CIS and the representations which CIS made in its promotional literature. Nor is it enough that the brokers should have known that this literature contained materially misleading information. The brokers must have "[a]ctual knowledge, or a reckless disregard for the truth which is equivalent to actual

knowledge * * *," *Katz v. Realty Equities Corp. of New York,* 406 F.Supp. 802, 805 (S.D.N.Y.1976), of the specific material fraudulent representations on which plaintiffs relied.

 With two exceptions, the reasons for certifying and not certifying a plaintiff class against CIS apply to certification of classes against the broker defendants. The first arguable distinction involves the predominance of common questions of scienter. Each of the three theories under which plaintiffs may recover present predominating common questions. First, plaintiffs would prevail if the data in the Performance Charts are on their face so improbable that a trier of fact could reasonably infer that individuals with the knowledge and expertise of a reasonably competent broker[12] would know that they were untrue or would act recklessly in disregarding their falsity.

Second, plaintiffs could prove their case against the broker defendants by establishing that their registered representative knew facts which contradicted the representations in the Performance Charts at least to the degree that they acted recklessly in distributing the charts. There is no substantial evidence that the registered representatives who dealt with prospective clients of CIS had any significant source of information about CIS other than CIS representatives and the research departments of their brokerage houses or, in other words, that individual account representatives did any substantial research on their own. *Cf. In re Scientific Control Corp. Securities Lit., supra,* 71 F.R.D. at 497–499 and 505 (individual research by account executives defeats predominance). There is no substantial evidence that CIS representatives told one version of its past performance to some individual registered representatives and another version to others or that the research departments in any brokerage houses gave certain information about the past performance of CIS to some of its registered representatives and not to

---

12. The presumption that a registered representative is reasonably competent would be rebuttable, but the Court does not expect the broker defendants to try to rebut that presumption in any significant number of cases.

others. Consequently, each account executive probably had the same information about the past performance of CIS, and questions involving whether individual registered representatives had knowledge putting them on notice of CIS's fraud present predominating common questions. If some individual registered representatives engaged recklessly or knowingly in the distribution of fraudulent literature, it is likely that most did. Whether the brokerage house itself (as distinguished from the registered representatives) would be liable under these circumstances also presents predominating common questions: If a brokerage house is liable or no for what one of its representatives did, it will be liable or no for most of the others.

Finally, plaintiffs could establish their case by demonstrating that research personnel in the brokerage houses responsible for investigating CIS (and it appears that each defendant brokerage house made some effort to find out about CIS) knew the full facts concerning CIS's past performance and knew the nature of the representations in the Performance Charts concerning past performance. Whether this kind of knowledge by members of the research staff would be sufficient to impose liability on the brokerage firm itself is a question which the Court need not decide. *Cf. Zweig v. Hearst Corp.,* 521 F.2d 1129, 1132–1133 (9 Cir. 1975) (good-faith defense available to controlling persons under § 20(a) of the Securities Exchange Act of 1934). The only question which the Court need decide and does decide is whether the liability of the brokerage house based on the conduct of its research staff involves predominating common questions of fact, and the answer is affirmative.

The other area where common questions arguably do not predominate involves receipt of a Performance Chart from a representative of the brokerage house. To recover from a brokerage house for its knowing participation in fraudulent conduct, a client of both CIS and a defendant broker who received a Performance Chart must demonstrate not only that he received the chart but that he received it directly or indirectly[13] from the broker. *See* p. 259, *supra.* Otherwise, the brokerage house would not participate in the fraud against that particular client. Proof of receipt does not defeat commonality or predominance, nor do individual problems of proof make the class action unmanageable, because they can be handled through notarized affidavits, *see* pp. 266–267, *supra.*

## III. CONCLUSION AND ORDER

The Court has "sufficient information to form a reasonable judgment" about the propriety of class certification. *See Blackie v. Barrack, supra,* 524 F.2d at 901 n. 17. This determination is inherently problematic because the Court's overall knowledge of the facts is necessarily limited. Lines between predominance of common questions and predominance of individual questions and between adequate alignment of interests of representative and absent plaintiffs and inadequate alignment cannot be drawn with scientific precision. Based on the evidence before it, the Court finds that provisional certification of the classes defined below is fair and proper. If subsequent events prove that the Court's current assessment of the factual and legal issues in this case is wrong, Rule 23(c)(1) gives the Court the means to cope with that development.

IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend the complaint is granted except with respect to their class claims against the broker defendants based on an alleged breach of fiduciary duty.

IT IS HEREBY FURTHER ORDERED that this action may be maintained as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class: The class consists of all persons who entered into agreements for investment advisory services with CIS between April 1, 1971,

---

13. If, as allegedly happened with plaintiff Sullivan, a broker defendant distributed the chart not to the client but to a member of the client's family, the broker would be liable if he knew the chart to be false and expected the family member to give the chart to the client or to tell the client about the information contained in the chart.

and May 31, 1973, and who received a copy of Performance Chart No. 1 or Performance Chart No. 2. The representative plaintiffs of this class are Mary W. Sullivan, William M. Shapiro, Fanne Z. Shapiro, and Kenneth W. Batchelor.

IT IS HEREBY FURTHER ORDERED that the class is divided into the following subclasses pursuant to Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure:

(a) Subclass A consists of all members of the class whose initial agreements with CIS designated Witter and its agents and employees as brokers for securities transactions to be executed by CIS on behalf of themselves and who obtained their copy of Performance Chart No. 1 or Performance Chart No. 2 from Witter and its agents and employees. The representative plaintiff for this subclass is Mary W. Sullivan.

(b) Subclass B consists of all members of the class whose initial agreements with CIS designated Mitchum and its agents and employees as brokers for securities transactions to be executed by CIS on behalf of themselves and who obtained their copy of Performance Chart No. 1 or Performance Chart No. 2 from Mitchum and its agents and employees. The representative plaintiffs for this subclass are William M. Shapiro and Fanne Z. Shapiro.

(c) Subclass C consists of all members of the class whose initial agreements with CIS designated Hutton and its agents and employees as brokers for securities transactions to be executed by CIS on behalf of themselves and who obtained their copy of Performance Chart No. 1 or Performance Chart No. 2 from Hutton and its agents and employees. The representative plaintiff for this subclass is Kenneth W. Batchelor.

(d) Subclass D consists of all members of the class who were residents of California at the time they entered into their initial agreements with CIS. The representative plaintiffs for this subclass are Mary W. Sullivan, William M. Shapiro, Fanne Z. Shapiro, and Kenneth W. Batchelor.

(e) Subclass E consists of all members of Subclass D who are also members of Subclass A. The representative plaintiff for this subclass is Mary W. Sullivan.

(f) Subclass F consists of all members of Subclass D who are also members of Subclass B. The representative plaintiffs for this subclass are William M. Shapiro and Fanne Z. Shapiro.

(g) Subclass G consists of all members of Subclass D who are also members of Subclass C. The representative plaintiff for this subclass is Kenneth W. Batchelor.

IT IS HEREBY FURTHER ORDERED that the parties shall negotiate a proposed notice to the class for submission to the Court for approval on July 13, 1978.

IT IS HEREBY FURTHER ORDERED that motions concerning the measure of damages will be heard at 9 A. M. on July 13, 1978.

IT IS HEREBY FURTHER ORDERED that a status conference will be held at 9 A. M. on July 13, 1978.