Michael F. MALONE, et al., Plaintiffs,

v.

MICRODYNE CORPORATION, et al., Defendants.

Civ. No. 92–1515–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 26, 1993.

Michael L. Shor, David & Hagner, P.C., Washington, DC, for plaintiffs.

Anthony T. Pierce, Akin, Gump, Hauer & Feld, L.L.P., Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this purported class action, purchasers of a corporation's common stock seek damages from the corporation and its officers for their dissemination of allegedly false and misleading information. Plaintiffs seek to certify a class consisting of purchasers of the corporation's stock during the period in which the defendants' alleged misrepresentations fraudulently inflated the price of the stock. Defendants oppose certification chiefly on the grounds that the claims of the named plaintiffs are not typical of those of the class and that issues of fact common to the class do not predominate over issues of fact specific to individual plaintiffs. Defendants' opposition to plaintiffs' motion for certification raises interesting questions with respect to the proof of causation in a securities fraud action.

I.

Defendant Microdyne Corporation ("Microdyne") is a Maryland corporation, with offices in Alexandria, Virginia. Microdyne designs, manufactures, and markets telemetry equipment and also manufactures and distributes computer and communications network products and software. Microdyne common stock is publicly held and is traded on the National Market System of NASDAQ. Defendant Philip Cunningham is the Chairman, President, and Chief Executive Officer of Microdyne. Defendant Christopher Maginniss is the Executive Vice–President and Treasurer of Microdyne.

On February 11, 1992, on the basis of information provided by Cunningham, a securities analyst's report was published estimating that Microdyne would earn $0.25 per share for its third fiscal quarter 1992, which would end June 30, 1992. Defendant Cunningham told the Dow Jones Newswire that he was "comfortable" with the analyst's earnings estimates for fiscal 1992 and fiscal 1993. Dow Jones Newswire reported Cunningham's comfort with the published earnings estimates over the wire on February 12, 1992. The price of Microdyne stock increased from $12¼ per share on the day of the analyst's report to $13⅝ per share on the

day Cunningham said he was "comfortable" with the report.

On several occasions between February 12, 1992, and June 15, 1992, Microdyne made public statements concerning its favorable growth prospects. These forecasts were supported, in part, by projections of large sales of two new products Microdyne introduced in April 1992: the NetWare Access Server ("NAS"), and the NetWare Asynchronous Communications Server ("NACS").

On June 15, 1992, Microdyne announced that its earnings for the third quarter would be $0.08 to $0.12 per share, rather than the $0.25 estimated by the analyst in February. The company stated that sales for the NAS and NACS would be substantially less than initially projected for the third quarter because the product selling cycle would be at least 90 days, rather than the initially forecasted 30 to 60 days, thereby causing profits to be realized later than expected. Following this announcement, the price of Microdyne stock fell to a low of $7¼ per share.

Subsequent to the June 15 announcement, Microdyne continued to assure the public in its quarterly report that market reaction to the new products had "been very positive." Analyst reports continued to project fourth quarter earnings at $0.14 to $0.21 per share. Nevertheless, on October 7, 1992, Microdyne announced that the anticipated sales of the NAS and NACS had not materialized and that the company was taking an after-tax loss of $0.17 per share for the fourth quarter, which ended September 30, 1992. The next day, October 8, Microdyne stock dropped to a low of $3¾ per share.

Plaintiff Michael Malone purchased 5,000 shares of Microdyne common stock for $13⅜ per share on February 12, 1992, after Cunningham's "comfort" statement had been published on the Dow Jones Newswire. Three days later, on February 15, 1992, plaintiff Seth Rosenberg purchased 5,000 shares of Microdyne common stock for $13⁵⁄₁₆ per share. In addition, Malone purchased 2,500 shares and Rosenberg purchased 5,000 shares of Microdyne common stock on June 17, 1992, at a price of $8½ per share, following Microdyne's June 15 disclosure.

Plaintiffs bring this action on behalf of themselves and a class consisting of all persons who purchased or otherwise acquired shares of Microdyne common stock from February 12, 1992, through October 8, 1992. In Count I of their First Amended Complaint, plaintiffs contend that Cunningham's "comfort" statement of February 12 was a false and misleading public announcement in violation of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, which caused plaintiffs to purchase Microdyne common stock at an artificially inflated price. They also argue that Microdyne's June 15 statement concerning earnings, and its Form 10–Q statements for the fiscal quarters ending March 31, 1992, and June 30, 1992, were false and misleading statements which perpetuated the market's inaccurate perception of Microdyne's earnings potential. In Count II, plaintiffs claim that the individual defendants are personally liable for the actions of Microdyne under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Count III seeks damages under a state common law theory of fraud.

The matter came before the Court on December 11, 1992, on plaintiffs' motion for class certification. At that time, the Court deferred ruling on the motion, pending discovery of the named plaintiffs on the issue of reliance. See *Doctor v. Seaboard Coast Line Railroad Co.*, 540 F.2d 699, 707 (4th Cir. 1976) (approving use of precertification discovery to determine if action was maintainable as class action). Depositions of the named plaintiffs were taken, and further argument on the motion for certification was heard on January 15, 1992. At the conclusion of the hearing, the Court certified the class on the federal claims alone, stating its reasons from the bench.[1] The matter is currently before the Court on defendants' motion for reconsideration. That motion is

---

1. The Court found that the state law claims set forth in Count III were inappropriate for summary judgment because individual issues of reliance were likely to predominate. Accordingly, the Court dismissed Count III, without prejudice, to allow plaintiffs to pursue these claims, if they desire, as a separate action in the proper forum.

hereby denied, but the Court is persuaded of the necessity for a more comprehensive exposition of the reasoning underlying its holding.

## II.

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. According to Rule 23(a), a class action may be maintained only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Furthermore, a potential class action must be shown to qualify under at least one subsection of Rule 23(b). Plaintiffs here rely on Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [2]

■ In evaluating a motion for class certification, the allegations made in support of certification are taken as true, and courts are not to undertake an examination of the merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). Plaintiffs bear the burden of showing that the class certification requirements have been met. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982).

Defendants do not dispute that plaintiffs satisfy the "numerosity" and "commonality" requirements of Rule 23(a). Nor do defendants seriously challenge the "adequacy" of plaintiffs Malone and Rosenberg to represent the interests of the class.[3] The Court finds that each of these requirements is met. Defendants instead focus their opposition to certification of the class on the grounds that: (1) individual issues of reliance will predominate, making a class action inappropriate under Rule 23(b)(3); and (2) plaintiffs Malone and Rosenberg face the prospect of successful defenses to their claims which are unavailable against other class members, thereby precluding a class action under the "typicality" requirement of Rule 23(a). Both arguments implicate the causation element of plaintiffs' section 10(b) claim. Accordingly, analysis of plaintiffs' burden in proving causation is an appropriate place to begin in resolving plaintiffs' motion for certification.

■ To recover under section 10(b), a plaintiff must establish that the alleged misrepresentation caused the injury suffered. *See, e.g., Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 967 F.2d 742, 748 (2nd Cir.1992). In this context, courts have held that proof of causation requires two discrete showings. First, a plaintiff must prove transaction causation—that plaintiff engaged in the transaction in question in reliance on the defendant's alleged misrepresentation or omission. Second, a plaintiff must prove loss causation—that the misrepresentation or omission caused plaintiff's economic harm. *See, e.g., Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2nd Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

**2.** Rule 23(b)(3) continues:
"The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

**3.** A separate action based on the same events was filed in this Court by stock purchasers Mayer

and Judith Gross. That case was consolidated with the present action by Order of the Court dated December 11, 1992. Based on the deposition testimony of Mayer Gross, the Court found Mayer and Judith Gross to lack sufficient familiarity with the allegations in this case to function as suitable class representatives. *See, e.g., Koenig v. Benson,* 117 F.R.D. 330, 337 (E.D.N.Y. 1987). As a result, Mayer and Judith Gross were stricken as named class representatives, but remain, unless they choose to "opt out," as unnamed members of the class.

In the instant case, defendants do not dispute that proof of loss causation can be addressed effectively on a class-wide basis. To show loss causation, plaintiffs need only prove that misrepresentations by the defendants inflated the price of Microdyne stock above where the price would have been in the absence of those misrepresentations. If this is shown, then plaintiffs, by purchasing Microdyne stock, will have suffered economic loss caused by defendants' actions. Plaintiffs may or may not be able to make this showing. In any event, proof of loss causation does not involve facts specific to individual plaintiffs.

Defendants argue that transaction causation, by contrast, is not amenable to resolution on a class-wide basis. This requirement, they contend, must be met by a showing that "the alleged misrepresentations or omissions *caused the plaintiff to engage* in the transaction in question." Def.Br. at 9; *see, e.g., Bennett,* 770 F.2d at 313. As a result, defendants argue, the transaction causation determination will depend on a separate inquiry into the investment motivation of each class member to determine whether each individual's decision to purchase Microdyne stock was influenced by defendants' alleged misrepresentations. For example, defendants point out that plaintiff Malone testified in his deposition that he bought Microdyne stock on the advice of his broker. Defendants suggest that even if this does not open Malone to an "atypical" defense on the issue of reliance (see discussion *infra.*) it is indicative of the potentially diverse range of motivations which caused members of the class to purchase Microdyne stock—many of which were likely unrelated to defendants' actions. Because such individual questions of fact will predominate over questions of fact common to the class, defendants argue that a class action is inappropriate under the terms of Rule 23(b)(3).

Defendants' argument is based on a misapprehension as to how transaction causation relates to plaintiffs' theory of recovery. Plaintiffs base their claims on the "fraud on the market" theory sanctioned by the Supreme Court in *Basic, Inc. v. Levin-son,* 485 U.S. 224, 226–28, 108 S.Ct. 978, 981, 99 L.Ed.2d 194 (1988). As set forth in *Basic:*

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic,* 485 U.S. at 241–42, 108 S.Ct. at 989, quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3rd Cir.1986). In light of the causal connection between material misstatements in an efficient marketplace and the price of a stock, the "fraud on the market" theory raises a rebuttable presumption of plaintiffs' reliance where, as plaintiffs allege happened here, "materially misleading statements have been disseminated into an impersonal, well-developed market for securities." *Basic,* 485 U.S. at 247, 108 S.Ct. at 991.

Defendants' interpretation of transaction causation is based on cases that did not proceed on a "fraud on the market" theory. In a "fraud on the market" case, the transaction causation element does not require a showing that defendants' misrepresentations induced every plaintiff to enter a transaction in the affected security. Rather, the transaction causation element is satisfied by a showing that the defendants' acts affected the *terms (i.e.* price) of the transaction. *See* Hanzen, *The Law of Securities Regulation* 467 (1985) (" '[T]ransaction causation' ... means that but for the wrongful conduct, the transaction would not have gone through, at least in the form that in eventually took."). As the Eighth Circuit has observed, "[In a] 'fraud on the market' case ... [c]ausation lies in the fact that the plaintiff relied on the market price of the security as an indicator of the future value of the stock." *In re Control Data Corp. Securities Litigation,* 933 F.2d 616, 619 (8th Cir.), *cert. denied,* —

U.S. ——, 112 S.Ct. 438, 116 L.Ed.2d 457 (1991).[4]

■ Transaction causation, in this sense, is precisely the same thing as "reliance," as used in the *Basic* opinion and, therefore, if the "fraud on the market" theory is found to be applicable, transaction causation must be presumed. *See Litton Industries*, 967 F.2d at 748 (plaintiff may "establish transaction causation by means of the 'fraud on the market' theory, which permits a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct"); *Control Data*, 933 F.2d at 619–20 ("To the extent that the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed."). The "fraud on the market" theory was crafted for the very purpose of avoiding the individualized causation inquiries proposed by the defendants as a bar to certification. Because the preconditions for application of the "fraud on the market" theory are all questions that can be determined on a class-wide basis (*i.e.* whether Microdyne stock traded on an efficient market, whether defendants' misrepresentations were material, etc.) and causation will be presumed if the theory is found to apply, it is clear that common questions of fact with regard to causation will predominate over issues specific to individual plaintiffs. Accordingly, this action may properly be pursued as a class action under Rule 23(b)(3).

■ Defendants' second argument against certification is that the named plaintiffs, Malone and Rosenberg, face potentially successful defenses which are atypical of the defenses that could be asserted against the rest of the class, thereby precluding certification under the terms of Rule 23(a)(3). There is uncontradicted testimony in this case that plaintiffs Malone and Rosenberg both initially bought Microdyne stock immediately after defendant Cunningham's "comfort" statement had allegedly inflated the price of the stock. Both of the named plaintiffs also purchased Microdyne stock after the stock had precipitously declined following Microdyne's June 15 announcement that the earlier projected sales of NAS and NACS would not be realized in the Third Quarter. Both plaintiffs have admitted to pursuing a strategy of "averaging down," that is, buying additional stock at a price lower than their initial investment, thereby reducing the average price per share of their total investment. Defendants point out that the strategy of "averaging down" only makes sense if an investor believes that the stock, at the lower price, is undervalued, and will subsequently rise. If the stock price declines even further, "averaging down" may decrease the average loss per share, but it increases an investor's absolute losses. Because the strategy assumes that the market has undervalued a stock, defendants argue that plaintiffs Malone and Rosenberg cannot avail themselves of the "fraud on the market" theory because they were not relying on the integrity of the market, they were actually betting against it. Defendants contend that this is an atypical defense, pertinent to the named plaintiffs, that must prevent certification of the class.[5]

---

4. Even if this action had not been premised on the "fraud on the market" theory, defendants' interpretation of the transaction causation element, which would require plaintiffs to prove that the defendants' misrepresentations caused them to purchase Microdyne stock, would make no intuitive sense in the present factual context. Plaintiffs allege that defendants' statements artificially inflated the price of Microdyne stock. Clearly, a stock at an inflated price is relatively less attractive to any investor than the same stock would be at a lower price. Thus, under defendants' formulation of the transaction causation requirement, it is unlikely that *any* investor would have been induced to purchase Microdyne stock *because of* the defendants' misrepresentations. Transaction causation in this factual context must mean that the defendants' statements affected the terms (*i.e.* the price) of the transaction, not that the statements were determinative of whether the transaction took place at all.

5. Defendants also argue that plaintiff Malone faces an "atypical" defense on the element of causation because of his testimony that he purchased Microdyne stock in reliance on the advice of his broker, not in reliance on defendants' statements. As shown above, however, plaintiffs need not prove that defendants' misrepresentations induced them to purchase the stock. Where, as here, plaintiffs proceed on a "fraud on the market" theory, causation flows from the mere fact that plaintiffs purchased stock at an inflated price, irrespective of their motivation for entering the transaction. *See, e.g., Schwartz v. System Software Associates, Inc.*, 138 F.R.D. 105

Defendants' argument confuses the concepts of integrity of the marketplace and integrity of the market price. The price of a stock is not based simply on a snapshot of the net value of a company at a particular point in time. Rather, the price at which a company's stock may be purchased in an efficient market is based on the market's assessment of the future earning potential of that company. The market assesses all relevant information—encompassing past, present, and forecasted future events and conditions—in arriving at the market price. *See Basic*, 485 U.S. at 246 & n. 24, 108 S.Ct. at 991 & n. 24 (collecting academic literature).

Whenever an investor purchases a particular stock with the expectation of realizing a profit in excess of the market's average return on investment for securities with a comparable risk, the investor is *per force* wagering that his individual assessment of the future earning potential of that company is superior to the assessment of the marketplace as a whole, presumably because he believes he has superior information or judgment. Thus, virtually every investment transaction is entered on the belief that a particular investment is undervalued by the market relative to other comparable investments. This does not mean that all investors motivated by the desire to make an above average return on their investment are not relying on the integrity of the marketplace. An investor may hold the conviction that the marketplace has inaccurately predicted the earning potential of a company, and yet still enter a transaction relying, in part, on the assumption that the market has not been artificially inflated or depressed by material, false information disseminated by corporate insiders. In other words, simply because an investor believes that the market price is an inaccurate assessment of the value of a stock, does not necessarily mean that the investor is not relying on the integrity of the market.[6]

Clearly, the "averaging down" strategy of plaintiffs Malone and Rosenberg, while premised on the notion that the market had undervalued the Microdyne stock, did not take into account that the price of the stock had been artificially inflated by the alleged misrepresentations of defendants. As a result, the "averaging down" strategy practiced by Malone and Rosenberg does not vitiate their reliance on the integrity of the market and does not subject them to defenses that are atypical in comparison to the remainder of the class. *C.f. In re Bally Manufacturing Securities Corp. Litigation*, 141 F.R.D. 262, 269 (N.D.Ill.1992) ("stock purchases by the named plaintiffs during the proposed class period, even if engineered largely on the basis of an investment strategy such as ... 'averaging down,' do not destroy typicality").[7]

### III.

For the foregoing reasons, defendants' motion to reconsider the Court's Order certifying the class pursuant to Rule 23, Fed.R.Civ. P., is denied. An appropriate order has issued.

---

(N.D.Ill.1991) (in "fraud on the market" case, reliance on broker's advice "does not rebut the presumption that [plaintiff] relied on the price reported by the broker being an accurate reflection of the stock's value").

**6.** The Court finds unpersuasive, and declines to follow, those cases cited by the defendants, such as *Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.Y. 1981), which fail to appreciate this distinction.

**7.** The instant case is distinguishable from those cases in which a plaintiff in a "fraud on the market" case enters an investment transaction while in the possession of inside information. In those instances, the investor is clearly not relying on the integrity of the market's pricing mechanism, but is instead attempting to capitalize on inefficiencies in the market's ability to disseminate information. *See, e.g., Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474 (S.D.N.Y.1989).