**Patrick V. MORRIS, Plaintiff,**

v.

**WACHOVIA SECURITIES, INC., Defendant.**

**No. CIV.A. 3:02CV797.**

United States District Court, E.D. Virginia, Richmond Division.

July 28, 2004.

Mark J. Krudy, Esquire, The Ironfronts, Richmond, VA, Steven G. Schulman, Esquire, Peter Safirstein, Esquire, Daniel R. Altman, Esquire, Milberg, Weiss, Bershad, Hynes & Lerach LLP, New York, NY, for Plaintiff.

James A. Murphy, Esquire, Harris L. Kay, Esquire, Cameron S. Matheson, LeClair Ryan, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this civil action, the Plaintiff, Patrick V. Morris, seeks to recover compensatory and/or rescissionary damages, prejudgment interest, disgorgement of profits, and costs and attorneys' fees from the Defendant, Wachovia Securities, Inc. ("Wachovia"), for alleged violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) ("1934 Act") and section 206 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–6) ("IAA"), in connection with Wachovia's Masters Program, a portfolio management service to which Morris subscribed.

Since initiating this action on November 1, 2002, Morris has amended the Complaint twice. Morris filed the Second Amended Complaint ("SAC"), the currently operative document in this case, on May 9, 2003. Soon thereafter, Wachovia filed a motion to dismiss the SAC under Fed. R. Civ. Proc. 12(b)(6), Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4). In a Memorandum Opinion dated August 12, 2003 (the "August 12 Opinion"), this Court granted in part and denied in part Wachovia's motion. *See generally Morris v. Wachovia Securities, Inc.*, 277 F.Supp.2d 622 (E.D.Va.2003).

Pursuant to Fed. R. Civ. Proc. 23(b)(3), Morris now seeks to certify a class for the remaining claims in the SAC. Morris endeavors to represent a class of "all persons and/or entities that enrolled in the 'First Union Securities Masters Investment Program' and/or the 'Wachovia Securities Masters Investment Consulting Program'... beginning April 26, 1999 through the date of the Complaint herein and continuing forward ... and were damaged thereby," and a subclass of "all persons and/or entities that waived re-

ceipt of trade-by-trade account confirmations and were damages as a result." SAC ¶ 1.

## STATEMENT OF FACTS

In December 2001, Morris enrolled in the Masters Program. As advertised, the Program gives investors with assets of $100,000 or more the ability to receive the services of Portfolio Managers, who usually only work with accounts of $1 million or more. SAC, Ex. 3, The Masters Program: Professional Wealth Management (hereinafter "Marketing Brochure"). For a single annual fee, Wachovia takes custody of an investor's assets, while individual Portfolio Managers make decisions about securities purchases for the investor's account. The Marketing Brochure describes the Masters Program as involving a three-step process. First, a Wachovia financial advisor [1] analyzes a client's investment needs and determines how the client's assets should be allocated. Based on this analysis, the financial advisor helps the client develop an investment policy statement that is then used by Wachovia in monitoring the client's account. *Id.*

In step two, Wachovia recommends to the investor Portfolio Managers "whose style, philosophy, and performance record best suit [the investor's] investment strategy." Marketing Brochure. The literature states that Wachovia undertakes the following process before recommending a Portfolio Manager:

> Our rigorous due-diligence process, carefully screens candidates. This screening process includes
>
> • reviewing credentials
>
> • determining their investment style
>
> • examining each manager's performance record
>
> • tracking the consistency of the returns in varying market conditions
>
> • evaluating and monitoring the level or risk taken by the manager, measured against the value of the returns generated

*Id. See also* SAC Ex. 2, Investment Consulting Advisory Services Disclosure Document

at 10 (hereinafter "Disclosure Document at __"). The Marketing Brochure goes on to explain that the Portfolio Managers chosen by the investor make the decisions about what securities will be bought and sold in the investor's account.

Finally, in step three of the process Wachovia monitors the activity and performance of the investor's portfolio. Wachovia claims that its financial advisors "closely track" the progress of investor portfolios and that Masters Program investors will receive comprehensive quarterly reports tracking the activity in their portfolios. Marketing Brochure; Disclosure Document at 11. In other words, the Masters Program documentation creates the impression that Wachovia monitors the performance of Masters Program Portfolio Managers to ensure quality and to assure investments that conform with clients' individual needs.

The Marketing Brochure also explains the "Value Added Service" that investors can expect to receive through the Program. Specifically, the literature provides that:

> In [Wachovia's] Masters Program, you work with a carefully assembled team of experts. These professionals add value through their systematic investment discipline, financial expertise, and personal attention to your objectives. *Your annual fee covers the comprehensive services vital to successfully managing a significant investment portfolio:*
>
> • Identification and analysis of your investment objectives
>
> • Access to a select roster of leading investment managers, evaluated on the following:
>
> • quality, stability, and depth of management
>
> • effective, disciplined, and consistent investment process
>
> • consistent long-term investment returns
>
> • solid performance relative to their peer group

---

1. The spelling "financial advisor" will be used throughout this Memorandum Opinion because it is consistent with the spelling used in Wachovia's Masters Program literature.

- Investment-manager search and recommendation

- Ongoing portfolio management and consultation with your [Wachovia representative]

- Investment manager's fees

- *All securities transaction costs*

- Custody of securities

- Automatic sweep of cash balances into money-market funds

- Monthly activity statements

- Quarterly portfolio evaluation and market overview

- Annual review of your objectives

Marketing Brochure (emphasis added). In the Disclosure Document, however, a footnote explains that the wrap fee "does not include certain dealer markups and markdowns including offering concessions, odd lot differentials, transfer taxes, exchange fees and any other fees required by law ...." Disclosure Document at 11.

Morris alleges that, based in large part on the representations made in Wachovia's Marketing Brochure and Disclosure Document, he agreed to enroll in the Masters Program in December 2001. Within several months of his enrollment, however, Morris saw his initial investment of approximately $1.4 million decline by over $300,000. SAC ¶ 19. Morris alleges that Wachovia committed securities fraud by misrepresenting and/or failing to disclose certain material facts about the Masters Program, which affected his ability to make an informed decision respecting whether or not he should participate in the Program. These omissions and/or misrepresentations included:

i. That [Wachovia's] selection of Investment Advisers was not based on factors such as whether the Investment Adviser generated sufficient commissions for Wachovia;

ii. That [Wachovia] failed to adequately monitor the Investment Advisers chosen for the Master [sic] Program; ...

iv. The misrepresentation of its intention to charge Plaintiff's account an "SEC Fee";

v. The overcharging of Plaintiff by inflating the SEC Fee ...

*Id.* ¶ 3. According to Morris, these misrepresentations and omissions give rise to two separate claims: (1) a claim for violations of section 10(b) of the 1934 Act and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder; and (2) a claim pursuant to section 215 of the IAA (15 U.S.C. § 80b–15) for violations of section 206 of the IAA.

As to the first claim under the 1934 Act, the SAC charges that Wachovia violated Rule 10b–5 by:

engag[ing] in a deceptive contrivance, scheme, practice, and course of conduct in connection with the purchase and sale of securities, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon Plaintiff and other members of the Class, misrepresented and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and other members of the Class. The purpose and effect of said scheme, practice and course of conduct was to create an illusion that ... Wachovia was not charging Plaintiff any "transaction" fees in excess of the Wrap Fee [and] ... Wachovia was properly calculating the SEC Fee.

SAC ¶ 71. The SAC further alleges that, as a consequence of the several omissions and misrepresentations, the Plaintiff and the other putative class members were "fraudulently induced to enroll and participate in the Masters Program" and were "over-charged for securities purchases and under-credited for securities sales." *Id.* ¶¶ 76–77.

Morris also alleges that Wachovia violated section 206 of the IAA. SAC ¶ 89. In support of this allegation, Morris claims that Wachovia was

engaging in a deceptive contrivance, scheme practice, and course of conduct pursuant to which [it] knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Plaintiff and other members of the Class. The purposes and effect of said scheme, practice

and course of conduct was to create the illusion that ... Wachovia was not charging Plaintiff any "transaction" fees in excess of the Wrap Fee; ... Wachovia was properly calculating the SEC Fee; ... and ... Wachovia was acting, pursuant to its fiduciary duty, in a disinterested capacity when selecting the Investment Advisers.

*Id.* As a result of these violations, Morris seeks rescission of the contract with Wachovia whereby he joined the Masters Program and the return of all fees paid in connection with the Masters Program.

In assessing both of the Plaintiff's claims, it is important to examine the terms of Morris's Investment Consulting Program Account Agreement (the "Agreement"), the standard form agreement that Wachovia enters into with each of its Masters Program clients. SAC, Ex. 1, Agreement (hereinafter "Agreement"). In Exhibit A to the Agreement, Morris specified the Portfolio Managers that he wanted to manage his account and the amount of his initial assets that each Manager was to control. This designation is important because, in the Agreement, Morris acknowledges that he received separate disclosure documents from each of the Portfolio Managers he selected. In addition, the Agreement contains several disclosures of its own. Of particular relevance to Morris's claims is the disclosure under the heading "FEE SCHEDULE," where Wachovia states that "[t]he [Masters Program] has a wrap fee schedule (*i.e.,* there are *no* separate charges for execution services or Masters Manager service). *See disclosure document for details of fee exclusions, calculation and refunds.*" *Id.* (emphasis added).

The Agreement requires Masters Program investors to acknowledge that they have received the Disclosure Document. This document contains additional disclosures pertinent to the due diligence process and the SEC fees, which are at issue in this litigation.

For purposes of assessing class certification, the universe of information relevant to the investment decision herein at issue will be considered to include also the Marketing Brochure and the disclosures—both oral and written—made by the Portfolio Managers Morris selected and his financial advisors at Wachovia. Significantly, the Marketing Brochure is identified as the source of many of the misrepresentations alleged in the SAC.

Finally, the trade-by-trade confirmation reports ("trade confirmations") and other monthly and periodic reports received by Masters Program investors are relevant to this litigation. However, Morris never received trade confirmations because he signed the Trade Confirmation/Proxy Waiver Authorization Form ("Waiver Form"). By signing the Waiver Form, Morris waived his right to receive trade confirmations and appointed his Portfolio Managers to receive the trade confirmations in his place. Plaintiff's Reply Memorandum of Law in Further Support of his Motion for Class Certification, Ex. 6, Waiver Form (hereinafter "Waiver Form"). The trade confirmations, which were received by the Portfolio Managers, noted that Wachovia charged the SEC fee and in what amount.[2]

The foregoing facts provide the context for considering the Plaintiff's motion for certification of a class action under Fed. R. Civ. Proc. 23.

## DISCUSSION

Fed. R. Civ. Proc. Rule 23(a) states the threshold requirements that apply to all class actions, while Rule 23(b) sets forth additional requirements for each of the three alternative types of class actions that can be brought. A party seeking class certification must first show that the action will meet all four requirements of Rule 23(a). Then, if those threshold requirements are met, the moving party also has the burden of showing that the action will meet the requirements of at least one part of Rule 23(b). *Amchem*

2. The Waiver Form also contains a so-called indemnity provision, which states that "I [Morris] agree to indemnify and hold First Union Securities and/or First Clearing Corporation, and their respective affiliates harmless from any liability, claims, expenses (including attorney fees), as a result of First Union Securities and/or First Clearing Corporation acting upon [the Waiver Form]." Waiver Form. Wachovia has asserted a counterclaim against the Plaintiff for attorneys' fees and costs based on that provision.

*Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Plaintiff seeks class certification under Rule 23(b)(3).

 The policy in the Fourth Circuit is "to give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application [that] will in the particular case best serve the ends of justice for affected parties and promote judicial efficiency." *In re A.H. Robins Company, Incorporated*, 880 F.2d 709, 740 (4th Cir.1989), *cert denied sub nom. Anderson v. Aetna Casualty and Surety Company*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (internal quotations marks omitted). *See also Jeffreys v. Communications Workers*, 212 F.R.D. 320, 322 (E.D.Va.2003). Moreover, it is generally recognized that "alleged violations of federal securities laws are particularly well suited for class action proceedings and that Rule 23 is to be construed liberally to effectuate that end." *Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C.1993); *In re Kirschner Medical Corporation Securities Litigation*, 139 F.R.D. 74, 77 (D.Md.1991) ("It is well-recognized that class actions are particularly appropriate to resolve ... claims alleging violations of the federal securities laws and that Rule 23 is to be construed liberally to effectuate that end."). Nevertheless, in applying Rule 23(a), the district court must perform "a rigorous analysis of the particular facts of the case." *A.H. Robins*, 880 F.2d at 728.

 The party seeking class certification bears the burden of establishing that the action meets the requirements of Rule 23. *A.H. Robins*, 880 F.2d at 728. The class action requirements must also be separately proven as to any proposed subclass. *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 441 (4th Cir.2003); *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir.1993).

"There is some question whether, in addressing class certification, the court should consider the merits of the case or instead credit the facts alleged in the complaint." *Fisher v. Virginia Electric and Power Company*, 217 F.R.D. 201, 211 (E.D.Va.2003). *Compare Shelton v. Pargo*, 582 F.2d 1298,

1312–13 (4th Cir.1978) ("In resolving the issue of class certification, the court may not confine itself to the allegations of the complaint. An intelligent decision on class certification requires 'at least a preliminary exploration of the merits' of the plaintiff's claim."); *Ostler v. Level 3 Communications, Inc.*, No IP 00–0718–C, 2002 WL 31040337 (S.D.Ind. Aug 27, 2002) (unpublished) ("In deciding whether to certify a class, the court is not required to accept the allegations in the complaint as true. The court should make any factual and legal inquiries that are needed to ensure that the prerequisites and requirements for class certification are satisfied, even if the underlying considerations overlap the merits of the case.") (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675–76 (7th Cir.2001)); *In re Bromine Antitrust Litigation*, 203 F.R.D. 403, 407 (S.D.Ind.2001), *with Jeffreys*, 212 F.R.D. at 322 ("To determine if a class should be certified, the court 'should accept as true the plaintiff's allegations concerning the merits of the case.' ") (quoting in part *Labbate-D'Alauro v. GC Services Limited Partnership*, 168 F.R.D. 451, 454 (E.D.N.Y.1996)); *Talbott v. GC Services Limited Partnership*, 191 F.R.D. 99, 101 (W.D.Va.2000).

The Supreme Court of the United States offered some limited guidance on this issue in *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), in which the Court held that Rule 23 did not give a district court authority to conduct a preliminary hearing into the merits of a suit in order to determine whether class certification was appropriate. In so holding, the Court reasoned that conducting a preliminary merits hearing would allow a representative plaintiff to secure the benefits of class action treatment without first satisfying the requirements of Rule 23. *Id.* On the other hand, eschewing a preliminary inquiry into the merits and accepting the allegations in the complaint as true accords the same benefits to the plaintiff with even less deference to the defendant's position. "In light of the conflicting precedent, the Court will inquire no further into the merits than is necessary to determine the likely contours of this action should it proceed on a representative basis."

*Fisher,* 217 F.R.D. at 211. *See also Brown v. Cameron–Brown Co.,* 92 F.R.D. 32, 37 (E.D.Va.1981) ("while the court may not put the plaintiff to preliminary proof of his claims, it may require such supplements to the pleadings to allow an informed judgment on each of the [Rule 23] requirements.").

## I. Rule 23(a) Requirements

Rule 23(a) provides that an action must meet the following threshold requirements before being certified as a class action: (1) numerosity, which is undisputed here,[3] requires that the class be so large as to make joinder of all class members impracticable; (2) commonality requires that there exist questions of law or fact common to the purported class members; (3) typicality necessitates that the claims of the named plaintiff must be typical of those of the class; and (4) adequacy of representation mandates that the class representative be capable of fairly and adequately protecting the interests of absent class members during the proceedings and at trial. *Amchem,* 521 U.S. at 613, 117 S.Ct. 2231.

### A. Commonality

Wachovia does not specifically argue that Morris has failed to meet the commonality requirement. Instead, Wachovia proceeds directly to argue that Morris has failed to meet the predominance requirement under Rule 23(b)(3). Commonality can be viewed as a component predominance under Rule 23(b)(3), and a finding of predominance often is used as a device to obviate the need to consider the commonality requirement separately. Therefore, some courts have analyzed the two requirements in tandem. Here, however, the requirements of Rules 23(a) and 23(b) will be considered separately and in turn, in recognition of the fact that, if the prerequisites of Rule 23(a) have not been met, the need to render an advisory opinion on Rule 23(b)(3) may be obviated.

■ Commonality requires that there be at least one question of law or fact common to the members of the class. *Jeffreys,* 212 F.R.D. at 322; *Central Wesleyan College v. W.R. Grace & Co.,* 143 F.R.D. 628, 636 (D.S.C.1992), *aff'd* 6 F.3d 177 (4th Cir.1993) (stating that commonality "does not require that all, or even most, issues be common, nor that common issues predominate, but only that common issues exist."). Commonality is a liberal standard, and the fact that there are some factual variances in individual grievances among class members does not defeat commonality. *Jeffreys,* 212 F.R.D. at 322. Courts have been particularly lenient in considering the commonality requirement in the context of securities fraud claims. *See, e.g., Simpson,* 149 F.R.D. at 98; *Yadlosky v. Grant Thornton L.L.P.,* 197 F.R.D. 292, 298 (E.D.Mich.2000) ("[I]t is for the predominance and other requirements of Rule 23(b)(3), rather than the common question requirement to function to keep the balance between the economies attained and lost by allowing a class action.") (quoting *Blackie v. Barrack,* 524 F.2d 891, 903 n. 19 (9th Cir. 1975)) (internal quotation marks and emphasis omitted).

■ In this action, the purported class members will present the same legal claims for relief. The SAC states that alleged misrepresentations and omissions in Wachovia's disclosures to Masters Program investors violate section 10(b) of the 1934 Act and Rule 10b–5 and section 206 of the IAA. To state a claim under section 10(b) of the 1934 Act, a plaintiff must establish that the defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) that the plaintiff reasonably relied on; and (5) that the plaintiff's reliance caused loss to be sustained. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1027 (4th Cir. 1997). The IAA requires that the plaintiff establish: (1) that the defendant is an investment adviser; (2) who used the mails or another instrumentality of interstate com-

---

**3.** In fact, the Defendant states that there are more than 33,582 Masters Program accounts that could be the subject of the proposed class action. Defendant's Memorandum in Opposition to Plaintiff's Motion for Class Certification at 4. Moreover, the customers to whom these accounts belong are geographically dispersed, given the fact that Wachovia offers its Masters Program in almost every state and in many foreign countries. Plaintiff's Memorandum of Law in Support of his Motion for Class Certification at 6 (hereinafter "Plaintiff's Opening Brief at __").

merce; (3) to make a misstatement or omission to a client; (4) that was material; and (5) the defendant acted negligently in so doing. *Morris*, 277 F.Supp.2d at 644. Pursuant to these claims, class members will seek to recover compensatory and/or rescissionary damages, prejudgment interest, disgorgement of profits, and costs and attorneys' fees.

All of the purported class members subscribed to the Masters Program. Morris claims that Wachovia, "in a series of public statements, uniform marketing materials and documents issued during the class period misrepresented and failed to disclose material facts concerning the company's masters program and fees that would be charged." Plaintiff's Opening Brief at 8. These public disclosures include the Marketing Brochure, the Disclosure Document, and the Agreement. Generally, these materials informed class members that Portfolio Managers in the Masters Program would be subjected to due diligence monitoring and that the Masters Program would be paid for on a wrap fee basis.

Also, Wachovia used the same means of calculating SEC fees—which is now alleged to be fraudulent—in debiting the accounts of all purported class members. It is undisputed that Wachovia charged an SEC fee to all of its Masters Program clients.

In assessing the merits of the case, there also will be common questions respecting whether Wachovia performed due diligence as to its Portfolio Managers and whether Wachovia was misrepresenting or omitting information about the charging of the SEC fee.

### 1. SEC Fees

Notwithstanding these similarities, there are significant differences in the nature of the evidence that will be used to assess the SEC fee claims presented pursuant to section 10(b) and Rule 10b–5 of the SEA and

pursuant to the IAA, which preclude a finding of commonality based on the SEC Fee issues. For example, the disclosures that Wachovia made to various members of the purported class will vary widely depending upon whether class members did or did not sign the Waiver Form, thereby electing not to receive trade confirmations. These reports disclosed that Wachovia was charging an SEC fee and informed investors of the amount of that fee. Thus, class members who received trade confirmations may be foreclosed from arguing that Wachovia has made a misrepresentation respecting the SEC fee.[4]

A further reason that the commonality requirement cannot be satisfied as to the class as a whole on the SEC Fee issues is that, in May 2003, Wachovia changed its marketing literature to disclose in explicit terms that Wachovia charges Masters Program investors the SEC fee. The new version of Wachovia's marketing brochure states that "[t]he [wrap] fee does not include certain dealer mark-ups or mark-downs, odd lot differentials, transfer taxes, exchange fees (among which SEC fees may be included), and any other fees required by law." Hubbard Depo. at 56–58 (internal quotation marks omitted). Class members who received this disclosure are in a very different posture than class members who enrolled in the Masters Program before May 2003.

Morris also seeks to certify a subclass of investors in the Masters Program who signed the Waiver Form. As currently defined temporally, this subclass presents commonality problems. First, it appears from the record that investors could not waive trade confirmations until after May 17, 2001. Before that date, Masters Program investors would have received information about SEC fees in their trade confirmations, even if they subsequently waived receipt of the trade confirmations after May 17, 2001. Second, the

---

**4.** It may be argued that class members who waived trade confirmations nevertheless had knowledge of the information in those reports under the doctrine of imputed knowledge. It is an elementary principle of agency law that an agent's knowledge of matters within the scope of the agency relationship is imputed to the principal. *See, e.g., Eitel v. Schmidlapp*, 459 F.2d 609, 615 (4th Cir.1972); *Allen Realty Corporation v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984). However, at the class certification stage it is inappropriate to delve too deeply into the merits of the propriety and legality of the Waiver Form, which is a hotly disputed issue in this litigation.

subclass again includes Masters Program investors who joined the Masters Program after May 2003, when the SEC fee disclosure was inserted in the marketing brochure.

If the subclass is limited to Masters Program investors between May 17, 2001 and May 2003 who waived trade confirmations, that subclass meets the commonality requirement. In assessing the claims of these class members, similar questions will be presented about whether the disclosures that Wachovia provided in the Agreement, Disclosure Document, and Marketing Brochure sufficiently apprised the class plaintiffs that an SEC fee would be charged. The Court will also have to assess whether the Waiver Form is lawful, whether its effect is to give investors imputed knowledge of the information in the trade confirmations, and whether the indemnification provision therein prevents suit on the basis of the SEC fee.

The Defendant argues that the commonality requirement is defeated by the fact that Morris has not affirmatively shown that all of the class members, or even he himself, read or received the Marketing Brochure, Disclosure Document, and Agreement and because class members received separate oral disclosures from their financial advisors at Wachovia and Portfolio Managers. Courts have held, however, that some variation in disclosures among class members will not defeat a finding of commonality. *Cf. Fisher*, 217 F.R.D. at 208; *Holsey v. Armour and Company*, 743 F.2d 199, 217 (4th Cir.1984) ("Despite the presence of individual factual questions, the commonality criterion of rule 23(a) is satisfied by the common questions of law and fact presented.").

Because the class members will rely on three common documents (the Marketing Brochure, Disclosure Document, and Agreement) to establish that the Defendant violated the securities laws, the materiality and reliance inquiries will pose common questions among the class members. Common questions will include the significance of Wachovia's misrepresentations, whether it would have been reasonable for an investor to factor those misrepresentations into his or her investment decisions, and whether a reasonable investor could have relied on the truth of Wachovia's statements in connection with its Masters Program.

The allegations in the SAC rely on a small number of documents issued by Wachovia. Thus, the scienter (under the 1934 Act) and negligence (under the IAA) inquiries will present common questions as well. *See Simpson*, 149 F.R.D. at 99; *Kirschner*, 139 F.R.D. at 79.

For the foregoing reasons, the temporally refined subclass, but only that subclass, meets the commonality requirement as to the section 10(b) of the 1934 Act and Rule 10b–5 and as to the IAA allegations that rely on the fraudulent charging of the SEC fee.

### 2. Due Diligence Claims Under the IAA

The commonality requirement is met by the class as a whole with respect to Morris's claims, under the IAA, regarding Wachovia's due diligence process. The information necessary to assess these claims includes the Masters Program Agreement, the Disclosure Document, and the Marketing Brochure. Thus, the claims of proposed class members will involve common evidence respecting whether the standardized disclosures Wachovia made about its due diligence process contained misrepresentations, in violation of the IAA. In addition, class members will present common questions about the materiality of Wachovia's literature to a reasonable investor. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (stating that the materiality element requires that "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). Since the disclosures were standardized and largely published from a centralized source in Wachovia, similar issues of the Defendant's negligence will also be presented.

Therefore, the proposed class meets the commonality requirement with respect to the due diligence inquiry under the IAA, and the proposed subclass (temporally limited to encompass only the period between May 17,

2001 and May 2003) meets the commonality requirement with respect to the IAA claims and the securities fraud claims.

## B. Typicality

 While the commonality inquiry focuses on the claims of the class as a whole, typicality looks at the claims of the named plaintiffs. "'The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.'" *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir.1998) (quoting *Sprague v. General Motors Corporation*, 133 F.3d 388, 399 (6th Cir.1998)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). In general, the typicality requirement is met when class representatives show that: (1) "their interests are squarely aligned with the interests of the class members"; and (2) "their claims arise from the same events or course of conduct and are premised on the same legal theories as the claims of the class members." *Fisher*, 217 F.R.D. at 212 (citing *Jeffreys*, 212 F.R.D. at 322 and *McGlothlin v. Connors*, 142 F.R.D. 626, 633 (W.D.Va.1992)). The claims of the class representative need not be identical to those of the other class members, however. *Broussard*, 155 F.3d at 344. "The proposed class satisfies the typicality requirement if the class representatives assert claims that fairly encompass those of the entire class, even if not identical." *Fisher*, 217 F.R.D. at 212 (citing *Broussard*, 155 F.3d at 344). Thus, differences in the claimed damages or the availability of certain defenses do not defeat typicality, as long as the class claims are generally based on the same legal or remedial theory. *Jeffreys*, 212 F.R.D. at 322.

 Morris received the Disclosure Document, the Agreement, and certain marketing literature (which he does not specifically remember, Morris Depo. at 21–22) from Wa-

chovia before opening his Masters Program account. The Defendant stresses that Morris, like other class members, received separate disclosures from his Portfolio Managers and financial advisors at Wachovia. This fact alone does not undermine typicality. *See Deutschman v. Beneficial Corporation*, 132 F.R.D. 359, 373 (D.Del.1990) (stating that "a 'no-reliance' defense in a securities fraud class action is not the kind of defense unique to the named plaintiff which would render his claim atypical.").[5] Moreover, it appears that the written disclosures that Morris received from his Portfolio Managers were similar, and apparently standardized, in material respects. Thus, Morris's claims are premised on the same general set of disclosures as the claims of the members of the class and refined subclass. Morris will also be required to prove the same legal elements to succeed on the merits of his claim as the other class members. *See Jeffreys*, 212 F.R.D. at 323 ("Because both Plaintiffs and the class members sustained identical legal injuries and must prove the same elements to succeed on [their] claim, the typicality requirement is satisfied.").

 Finally, the existence of a defense as to the named plaintiff but not others may defeat typicality. *Cf. Gunnells*, 348 F.3d at 438 ("[A]ffirmative defenses must be factored into the calculus of whether common issues predominate."); *Broussard*, 155 F.3d at 342; *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 597 (4th Cir.1976). *But see Simpson*, 149 F.R.D. at 101 n. 5 ("While ... an arguable defense which will distract named plaintiff's attention from common issues can render him atypical to defeat class certification, it is not the rule that the Court *must* always deny class certification whenever a potential defense is raised."). The Defendant argues that the fact that the statute of limitations might prevent some class members who joined the Masters Program before November 1, 2000 from maintaining a cause of action against Wachovia defeats typicality here. The Defendant has not shown that this defense even applies to Morris, however.

---

**5.** Morris also has testified that he relied on oral statements made by his Wachovia financial advisors, Carl Hornstra and Linda Davidson. Mor-

ris does not rely on these oral disclosures in making his claims against Wachovia.

Moreover, courts have held that a statute of limitations defense as to the named plaintiff will not ordinarily defeat typicality because the issue of whether or not a statute of limitations applies is a merits determination that cannot be assessed at the class certification stage. Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 22:28 (4th ed.2002).

For the foregoing reasons, the class meets the typicality requirements of Rule 23(a) for purposes of assessing the due diligence claims under the IAA, and the refined subclass meets the typicality requirements for purposes of assessing the section 10(b) and Rule 10b–5 claims under the 1934 Act and the IAA claims.

## C. Adequacy of Representation

■ The adequacy of representation requirement functions, along with the commonality and typicality requirements, to ensure that the class action is economical and that the named plaintiff will adequately protect the interests of absent class members. *Amchem*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231; *General Telephone Company v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This requirement satisfies the mandate of the due process clause that the named plaintiff possess undivided loyalty to potential class members by uncovering any conflicts of interests that may exist between the named plaintiff and the class.[6] *See Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *Broussard*, 155 F.3d at 338. It is not sufficient that the class representative be able to adequately represent the interests of the class only on the issue of liability because "a conflict between the class members and the class representatives respecting the appropriate relief may preclude class certification on the issue of damages." *Fisher*, 217 F.R.D. at 212 (citing *Broussard*, 155 F.3d at 337).

■ Wachovia argues, first, that Morris is an inadequate class representative because he is not competent to preside over and command the course of this litigation. Specifically, Wachovia points to Morris's lack of

understanding of some financial terms and his inexperience respecting investment terms and issues. Morris Depo. at 33–34, 37, 41–42. However, these perceived shortcomings do not preclude Morris from being an adequate class representative. It is sufficient that the named plaintiff "have a general understanding of the facts and claims at issue, as well as illustrate a commitment to the case." *Jeffreys*, 212 F.R.D. at 323. "In a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells*, 348 F.3d at 430. Only if the class representatives' "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case" should they fail to meet the adequacy of representation requirement. *Kirkpatrick v. J.C. Bradford & Company*, 827 F.2d 718, 728 (11th Cir.1987).

■ In his deposition, Morris indicated that he saw the SAC, was able to accurately describe it, knew that his claims were being asserted in the form of a class action, understood his duty "to stay with this litigation and to see it through to fruition," made decisions about the progress of litigation with advice of counsel, and knew about both the counterclaim and the motion to dismiss it. Morris Depo. at 35–41. This is certainly sufficient to establish that Morris is an adequate class representative. *Cf. McGlothlin*, 142 F.R.D. at 634. Therefore, Morris is an adequate class representative for the refined subclass on the SEC fee issues under the 1934 Act.

On the other hand, Morris does not meet the adequacy requirement with respect to the IAA claims, for either the class or the refined subclass. In the SAC, Morris seeks an order "declaring Class Members' agreements with Wachovia void and either awarding restitution equal to all consideration paid by Plaintiff and the Class Members of the agreement or rescinding these agreements." SAC, Prayer for Judgment and Relief ¶ 3.

In a similar case where the plaintiffs sought rescission as a remedy, *Lukenas v. Bryce's Mountain Resort, Inc.*, 66 F.R.D. 69

---

**6.** The Defendant does not challenge the adequacy of class counsel.

(W.D.Va.1975), *aff'd* 538 F.2d 594 (4th Cir. 1976), the district court found that the adequacy of representation standard had not been met. *Lukenas* involved a class of 610 current property owners, of whom only 190 wanted to rescind their agreements with the defendants. *Id.* at 71–72. The court found that a conflict of interests existed between the 190 class members who wanted to rescind their contracts and the remaining 420 class members. *Id.* at 71. The court stated that:

> [t]he interests of this minority of purchasers in the suit is clearly antagonistic to that of those purchasers who have a continuing interest in the financial viability of the defendant. Those purchasers who do not desire to rescind their agreements are dependent upon defendant to provide essential services such as roads and sewers as well as recreational services, all of which would be jeopardized by the right to rescission which plaintiffs seek to establish. The court agrees with the defendant that denial of class certification in this case is supported by those cases in which courts have refused to allow a terminated franchisee to represent a class including current franchisees because of the continuing interest of the current franchisees in the economic viability of the defendant franchisor.

*Id.* at 72. The court further held that providing potential class members opt-out rights on the issue of damages would not cure the conflict of interests because "the opt out provisions of Rule 23(c)(2) may not be used to achieve compliance with the prerequisites of 23(a)." *Id.See also Jackson National Life Insurance Company Premium Litigation,* 209 F.R.D. 134, 142 (W.D.Mich.2002) (reaching the same conclusion because "the legal enforceability of policies purchased by [class members] who opted out would nonetheless unavoidably be impugned. There would thus be a potential antagonism of interests.").

On appeal, the Fourth Circuit upheld the district court's denial of class certification. Although the Fourth Circuit did not hold that a rescission claim could never receive class treatment, the nature of the conflict that it identified and its reasoning strongly suggest that claims seeking rescission must be given special scrutiny.

Furthermore, like the Fourth Circuit, a majority of courts in other circuits that have addressed the issue have refused to certify a class action where a rescissionary remedy is sought. *See, e.g., James v. Home Construction Company of Mobile, Inc.,* 621 F.2d 727, 731 n. 7 (5th Cir.1980) (emphasizing "the conflict among parties seeking rescission from a credit institution of limited solvency."); *In re Jackson National Life Insurance Company Premium Litigation,* 209 F.R.D. 134, 142 (W.D.Mich.2002) (finding that the named plaintiffs' "claims for rescission are antagonistic to the interests of other putative class members."); *Jefferson v. Security Pacific Financial Services, Inc.,* 162 F.R.D. 123, 126 (N.D.Ill.1995) (finding that rescission under the Truth–in–Lending Act was a "purely personal remedy" and that it was unsuited to class action treatment); *Jefferson v. Security Pacific Financial Services, Inc.,* 161 F.R.D. 63, 69 n. 16 (N.D.Ill. 1995) (stating that a rescission class action was improper under the Truth–in–Lending Act and that the potential for conflict between class members seeking rescission and those not seeking rescission would "serve as a basis for denying class certification on adequacy of representation grounds under Rule 23(a)(4)."); *Elliott v. ITT Corporation,* 150 F.R.D. 569, 585 (N.D.Ill.1992) (holding that the weight of authority indicated that class certification was improper in an action seeking rescission, in part because of the potential for conflict of interests among class members); *Nelson v. United Credit Plan, Inc.,* 77 F.R.D. 54, 58 (E.D.La.1978) (stating that the adequacy of representation criterion was not met because of the "obvious conflict among the interests of parties seeking rescission relief from a credit institution of limited solvency" and holding that "the propriety of ever pursuing rescission under the Truth–in–Lending Act through a class action is open to serious doubt.") *Young v. Trailwood Lakes, Inc.,* 61 F.R.D. 666, 667 (E.D.Ky.1974) (finding that the complaint "involves demands for both rescission and damages; these conceivably antagonistic goals preclude effective administration as a class action."). *But see McIntosh v. Irwin*

*Union Bank and Trust Company,* 215 F.R.D. 26, 32–33 (D.Mass.2003) (holding that a class action could be maintained under the Truth–in–Lending Act when the plaintiffs sought only a declaratory judgment that class members were entitled to rescission and where the rescission phase of litigation occurred on an opt-out basis, but recognizing the abundant authority in opposition to its holding); *Bryan v. Amrep Corporation,* 429 F.Supp. 313 (S.D.N.Y.1977) (distinguishing *Lukenas* and granting certification to a class under the Interstate Land Sales Full Disclosure Act that sought rescission because the class was narrowly defined and any potential conflict of interests was too speculative).

The Fourth Circuit also provided relevant analogous authority in *Broussard,* wherein the named plaintiffs purported to represent a class of former and current Meineke franchisees. *Broussard,* 155 F.3d at 338. The district court had certified a non-opt-out class under Rule 23(b). *Id.* In decertifying the class, the Fourth Circuit explained that: "the district court might reasonably have been concerned that the plaintiffs' residual forward-looking interest, as current franchisees, in Meineke's continued viability would have tempered their zeal for damages and prejudiced the backward-looking interests of former franchisees." *Id. Cf. Seligson v. Plum Tree, Inc.,* 61 F.R.D. 343, 346 (E.D.Pa.1973) (finding that, because current franchisees had a continued interest in the defendant's financial liability, there was a "problem of former franchisees adequately representing the interests of present franchisees."); *Free World Foreign Cars, Inc. v. Alfa Romeo,* 55 F.R.D. 26, 29 (S.D.N.Y.1972) ("Plaintiff's interest as a former and terminated franchisee is not co-extensive and consistent with those of the present franchisees, who . . . presently depend upon the economic viability of the defendant."); *Van Allen v. Circle K Corporation,* 58 F.R.D. 562, 564 (C.D.Cal.1972) ("[I]t would appear from the record that the interest of the suggested classes would be adverse. Those members of the suggested class who are at present independent operators would seem to be interested in carrying on their operation with a strong defendant able to perform his obligations and able to create a favorable public attitude . . . . Those

members of the suggested class of former independent operators would be indifferent to anything other than financial recovery to the fullest extent from defendant"). Although the conflict of interests feared in *Broussard* apparently never materialized in that case, the Fourth Circuit determined that class certification was improper. *Id.*

There is little precedent concerning the specific issue of the appropriateness of a class action seeking rescission under the IAA. The starting point in this analysis is the opinion of the Supreme Court of the United States in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The Court emphasized that the IAA provides only a "limited private remedy" in the form of equitable relief. *Id.* at 24, 100 S.Ct. 242. The Court held that plaintiffs could obtain a judicial declaration of their power to void their contracts with the defendants, which would generally be furnished through rescission and a right to restitution of consideration paid for a contract that violated the IAA. *Id.* at 24–25, 100 S.Ct. 242. Finally, the Court explained that the IAA conferred "no other private causes of action, legal or equitable." *Id.* at 24, 100 S.Ct. 242. In so holding, the Court emphasized the purposes of the IAA, which were to protect individual investors and their fiduciary relationships with their individual investment advisors. The private and personal nature of a fiduciary relationship suggests that the remedy conferred under the IAA is intended to be similarly personal and limited.

Nevertheless, courts in jurisdictions other than the Fourth Circuit have certified class actions under the IAA. *See, e.g., Tedesco v. Mishkin,* 689 F.Supp. 1327, 1337 (S.D.N.Y. 1988); *In re Federal Bank & Trust Company, Ltd.,* 1984 U.S. Dist. LEXIS 18568 (D.Ore.1984) (unpublished); *Sullivan v. Chase Investment Services of Boston, Inc.,* 79 F.R.D. 246, 259 (C.D.Cal.1978). In granting certification, none of these courts addressed rescissionary relief at all, much less the potential complications that granting rescission would involve in the context of a class action. *See, e.g., Tedesco,* 689 F.Supp. at 1329, 1335 (noting only that the plaintiffs

were seeking "damages and other relief" and holding in general that "the possibility of individual questions as to ... damages is not sufficient to deny class certification."); *Federal Bank and Trust Company*, 1984 U.S. Dist LEXIS 18568, at *2 (indicating only that the plaintiffs were seeking damages in the suit, which also involved securities law claims); *Sullivan*, 79 F.R.D. at 262–65 (addressing an IAA claim for damages brought before *Transamerica*). Thus, it is inappropriate to read any of these cases as standing for the affirmative proposition that rescission suits under the IAA are amenable to class-wide resolution.

In this case, Morris seeks to represent a class of both former and current Masters Program investors. As in *Broussard* and *Lukenas*, there is a potential conflict between these groups because current investors have an interest in the continuing viability of the Masters Program. At this stage of the litigation, it is not clear how many potential class members would seek rescission and how many would be opposed to rescission. However, given the economic recovery since the period here at issue and given the diversity of Masters Program accounts, it is reasonable to conclude that a number of those who remain invested in the Masters Program would not want to nullify their investment relationships. Moreover, the declaratory judgment that the Plaintiff seeks—an order stating that all Masters Program Agreements are void[7]—would seriously impugn the Masters Program and would present the prospect of jeopardy to the assets of current Masters Program investors. Because the conflict of interests over appropriate relief in this case is fundamental, it defeats the adequacy of representation requirement.

Therefore, the IAA claims cannot survive the Rule 23(a) inquiry, and they are not amenable to class treatment. As refined, the proposed subclass meets the requirements of Rule 23(a) for purposes of assessing the SEC fee claims under the 1934 Act, and it must then be assessed under the requirements of Rule 23(b).

## II. Rule 23(b)(3) Requirements

Class certification under Rule 23(b)(3) is appropriate when the court finds: (1) that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed.R.Civ.P. 23(b)(3).

### A. Predominance

██ Predominance requires a determination of whether common questions of law or fact predominate over any questions affecting only individual class members. The task is to ascertain whether the class is cohesive enough to warrant adjudication by representation. *Jeffreys*, 212 F.R.D. at 323. "In determining whether the predominance standard is met, courts focus on the issue of liability, and if the liability issue is common to the class." *Kirschner*, 139 F.R.D. at 80. Thus, differences in damages among the potential class members do not generally defeat predominance if liability is common to the class. *Jeffreys*, 212 F.R.D. at 323. In cases where the damages inquiry is factually complex, however, the Fourth Circuit has held that class certification remains inappropriate even if common issues predominate respecting liability. *See Windham v. American Brands, Inc.*, 565 F.2d 59, 67–68 (4th Cir. 1977) (en banc).

██ It must be determined whether common questions of law and fact predominate respecting whether Wachovia has violated section 10(b) of the 1934 Act and Rule 10b–5 by misrepresenting the wrap fee nature of the Masters Program and misrepresenting that it was properly charging SEC fees to its clients. Whereas there are sufficient common questions for a finding of commonality, the differences that arise in resolving these common questions predominate in this action. First, the mix of information available to each individual Masters Program investor varies in significant respects. Morris asserts

---

7. It is highly doubtful that it would be appropriate to declare that the Masters Program Agreements are void. However, upon a proper show-ing, they might be declared, at least conceptually, voidable. A declaration of that sort would present the same conflict.

that the claims of the purported class arise out of three standardized documents—the Marketing Brochure, the Agreement, and the Disclosure Document. Masters Program investors had to sign the Agreement before enrolling in the Masters Program, and the Agreement contains an acknowledgment that the investor received the Disclosure Document. Access to these documents may therefore be presumed. However, there is no evidence that any purported subclass member received the Marketing Brochure, and that document is the basis for most of the claimed misrepresentations in the SAC. In fact, at his deposition Morris testified that he did not remember receiving or reading the Marketing Brochure. To further complicate matters, it appears that the content of the Masters Program literature was modified over time so that different investors in the Masters Program received somewhat different documents. *See generally* Hubbard Depo. Thus, the admonition of the Advisory Committee that drafted Rule 23 is particularly apt here: "a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." *See* Advisory Committee on Rule 23, Proposed Amendments to the Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966).

In addition, Masters Program investors worked with individual financial advisors at Wachovia in setting up and managing their Masters Program accounts, and with Portfolio Managers, who controlled the assets in those accounts. Morris contends that the oral and other representations made by Portfolio Managers or Wachovia financial advisors are not the basis for the securities fraud claims in the SAC. The Plaintiff may also be entitled to some presumption that, because these individuals were trained for and participated in the same program, the Masters Program, their discussions with clients would have relayed similar information. Indeed, Morris testified that his financial advisor provided him with information consistent with the information in the Marketing Brochure. And, courts in this Circuit have granted class certification despite asserted differences in the oral disclosures made to investors. *Cf.*

*Malone v. Microdyne Corporation,* 148 F.R.D. 153, 157 (E.D.Va.1993) (granting class certification even though one of the named plaintiffs had admitted during a deposition to relying in part on the advice of his broker); *Frankel v. Wyllie and Thornhill, Inc.,* 55 F.R.D. 330, 335–36 (W.D.Va.1972) (finding that the issues common to the class in terms of the defendant's alleged scheme of fraud predominated over any individual differences in some of the disclosures that the plaintiffs may have received).

On the other hand, when coupled with the differences that abound in the written disclosures to Masters Program investors, the oral nature of some of the representations will further individualize the inquiry that must be made respecting Wachovia's alleged misrepresentations. Morris cannot alleviate this problem, merely by averring that he does not plan to rely on any oral representations in making his claims. The fact remains that some Masters Program investors may have received information that would refute, or at least enlighten, the alleged misrepresentations made in Wachovia's written materials. Moreover, Morris has testified that the representations on which he relied in joining the Masters Program were those made orally by his Wachovia financial advisor. Morris Depo. at 28, 31–32. For those reasons, determining the basic question of whether Wachovia has made any misrepresentations to Masters Program investors, and what those misrepresentations were, will involve many differences among class members.

The next issue, materiality, also will be problematic. Materiality requires proof that "there is a substantial likelihood that a reasonable investor would consider [the information] important in deciding how to vote" and that "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries,* 426 U.S. at 449, 96 S.Ct. 2126. Because Morris has failed to establish that a certain set of common representations was available to Masters Program investors, it will be difficult to assess the materiality of those representations on a classwide basis. Indeed, Morris testified that he relied almost

exclusively on oral representations from his financial advisors at Wachovia in deciding to enroll in the Masters Program. Morris Depo. at 28–32. Other class members may have focused on different oral or written disclosures. Therefore, materiality will involve a piecemeal and individualized assessment of the import of any given disclosure to each member of the purported subclass, in light of the specific information he or she received about the Masters Program.

The reliance element of a section 10(b) and Rule 10b–5 cause of action will also present predominantly different questions of fact and law among purported subclass members. The allegations respecting the Masters Program do not arise under a "fraud-on-the-market" theory, so reliance cannot be presumed under that theory. *See, e.g., Horowitz v. Pownall,* 105 F.R.D. 615, 620 (D.Md. 1985), *aff'd Zimmerman v. Bell,* 800 F.2d 386 (4th Cir.1986). The Fourth Circuit also has held that, when a complaint alleges illegal omissions of information, reliance need not be shown, but can be inferred from a showing of materiality. *Banca Cremi,* 132 F.3d at 1028 n. 13. In *Banca Cremi,* however, the Fourth Circuit held that there is no presumption of reliance from the element of materiality " 'when the plaintiff alleges both nondisclosure and positive misinterpretation instead of only nondisclosure.' " *Banca Cremi,* 132 F.3d at 1028 n. 13 (quoting *Cox v. Collins,* 7 F.3d 394, 395–96 (4th Cir.1993)).

Because the SAC alleges misrepresentations or, at best, a combination of misrepresentation and omission, reliance cannot be presumed. The Supreme Court has recognized that "[r]equiring proof of individualized reliance from each member of [a] proposed plaintiff class effectively would . . . prevent[ ] [plaintiffs] from proceeding with a class action, since individual issues . . . would . . . overwhelm[ ] common ones." *Basic Inc. v. Levinson,* 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *See also Bear v. Oglebay,* 142 F.R.D. 129, 132 (N.D.W.Va.1992) ("[A]ctions alleging securities fraud and com-

mon law fraud are not generally amenable to class certification due to the requirement of proving individual reliance upon allegedly fraudulent behavior."); *Lewis v. Capital Mortgage Investments,* 78 F.R.D. 295, 308 (D.Md.1977).

 Where individual reliance must be proven, individual issues will predominate over other common issues among class members because of the multi-factor test used by the Fourth Circuit to assess reliance. In determining whether an investor is justified in relying on misrepresentations made by the defendant, a court must weigh

(1) the sophistication and expertise of the plaintiff in financial and securities matters;

(2) the existence of long standing business or personal relationships;

(3) access to relevant information;

(4) the existence of a fiduciary relationship;

(5) concealment of the fraud;

(6) the opportunity to detect the fraud;

(7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and

(8) the generality or specificity of the misrepresentations.[8]

*Banca Cremi,* 132 F.3d at 1028 (quoting in part *Myers,* 950 F.2d at 167). No single factor is dispositive of the issue of reliance. *Id.*

Because Wachovia was acting as an investment advisor vis à vis Masters Program investors, the existence of a fiduciary relationship between Wachovia and individual members of the subclass (the fourth *Banca Cremi* factor) can be established on a class-wide basis. The other seven *Banca Cremi* factors, however, all present barriers to class treatment. Because the representations made to individual class members will differ, the factors of concealment, the nature of the misrepresentations made, and the investor's

---

8. In addition, these elements of reliance are subdivided, complicating the inquiry even further. For example, in assessing a plaintiff's sophistication, a court should consider the plaintiff's " 'wealth[,] . . . age, education, professional sta-

tus, investment expertise, and business background.' " *Banca Cremi,* 132 F.3d at 1029 (quoting *Myers v. Finkle,* 950 F.2d 165, 168 (4th Cir.1991)).

opportunity to detect the fraud are not amenable to class treatment. *See Broussard,* 155 F.3d at 341 (declining to certify the class because there was a question respecting whether the plaintiffs had received a common set of disclosures from the defendant and therefore "the reliance element . . . [was] not readily susceptible to classwide proof."); *Zimmerman,* 800 F.2d at 390 (refusing to certify the class "[b]ecause the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder"); *Clark v. Cameron–Brown Company,* 72 F.R.D. 48, 63 (M.D.N.C.1976). And, the remaining four factors all require inquiries into the particular personal circumstances of individual class members.

Indeed, in a series of recent cases, the Fourth Circuit has held that a class may not be certified where individual questions of reliance are presented. First in *Broussard,* the court addressed the claims of several franchise owners against the franchisor for breach of contract, fraud, and unfair trade practices, among other causes of action. *Broussard,* 155 F.3d at 333. The owners moved to certify a class of all franchise owners, and the district court had granted the motion. *Id.* The Fourth Circuit reversed the district court's decision, concluding that the plaintiffs had failed to establish even the Rule 23(a) requirements. The court noted first that reliance could not be presumed under the facts of the case, but had to be proven. The court then concluded that "proof of reasonable reliance would depend upon a fact-intensive inquiry into what information each franchisee actually had." *Id.* at 341. While the court's conclusion was largely based on the circumstances of that case and the fact that the record revealed that the universe of disclosures available was broad and varied, the court also made a more general observation that was then taken up in later cases. The court cited the "inherent individuality" of the reliance inquiry and held that "because reliance 'must be applied with factual precision,' plaintiffs' fraud . . . claim[ ] do[es] not provide 'a suitable case for classwide relief.'" *Id.* at 342 (quoting in part *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 953 (8th Cir.1994)).

Then, in *Gunnells,* the Fourth Circuit addressed a motion for certification of a class advancing several claims, including one for common law fraud. *Gunnells,* 348 F.3d at 434–35. As in this action, the claims of the plaintiffs precluded a presumption of reliance and instead required proof of actual reliance. *Id.* at 435. The court cited *Broussard* for the proposition that the reliance element in a fraud context was not ordinarily susceptible to classwide proof. *Id.* And, specifically, the court stressed the individualized nature of the reliance inquiry presented in that case because proof of reliance would "depend upon the various circumstances involved, such as the form and materialty [sic] of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties." *Id.* at 436 (quoting *Giles v. Lanford & Gibson, Inc.,* 285 S.C. 285, 328 S.E.2d 916, 918 (1985)) (emphasis omitted). Therefore, the Fourth Circuit concluded that individual issues of reliance predominated, thereby foreclosing class certification. *Id.* at 436–37 ("Absent [the] assumption or presumption [of reliance], individualized issues clearly predominate . . . . 'Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones.'") (quoting in part *Basic,* 485 U.S. at 242, 108 S.Ct. 978).

Finally, in *Gariety v. Grant Thornton, LLP,* 368 F.3d 356 (4th Cir.2004), the Fourth Circuit recently remanded for further consideration a district court order certifying a class in the securities fraud context. The plaintiffs were shareholders of a company that had been audited by the defendant, and the plaintiffs' claims included claims for federal securities fraud under section 10(b) of the 1934 Act and Rule 10b–5. *Id.* at 360. The district court had certified a class of shareholders, based on the plaintiffs' representation that the "fraud-on-the-market" theory established a presumption of reliance in the case. *Id.* at 361. The court of appeals

held, however, that there was insufficient information to determine whether the presumption did apply and that, if reliance had to be proven on an individual basis, "individual issues would then likely 'overwhelm' ... common ones and preclude the court from finding satisfaction of the predominance requirement." *Id.* at 362. The court stated that "[b]ecause proof of reliance is generally individualized to each plaintiff allegedly defrauded, ... fraud ... claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action." [9] *Id.*

Therefore, under Fourth Circuit precedent, the individualized issues of reliance presented in this case will overwhelm common issues, defeating a finding of predominance.

Finally, because of the differences in the nature of the disclosures (oral and written) available to Masters Program investors, differences in fact will also be present in deciding the scienter element of the securities fraud causes of action alleged by Morris. That too militates against class certification.

Because the Court will have to inquire into whether and what information the purported subclass members received from Wachovia, individualized issues will be presented and will predominate over common ones in determining whether the elements of the section 10(b) and Rule 10b–5 claims in the SAC have been established. Therefore, the SEC fee claims of the refined subclass under section 10(b) of the 1934 Act and Rule 10b–5 cannot be determined on a classwide basis.

## B. Superiority

In light of the finding that common issues do not predominate over individual ones, it is not necessary to address the issue of the superiority of a class action over individualized adjudication of the claims presented in the SAC.

---

9. In a series of district court cases decided without the benefit of *Broussard, Gunnells,* and *Gariety,* class actions were certified, notwithstanding the potential for individualized issues respecting reliance. *See, e.g., Simpson,* 149 F.R.D. at 101; *Kirschner,* 139 F.R.D. at 83; *Malone,* 148 F.R.D. at 157. These courts were animated by the fear that an overly-stringent reliance inquiry would make it "unlikely that *any* investor would have been induced to purchase [the defendant's product] *because of* the defendants' misrepresentations." *Malone,* 148 F.R.D. at 158 n. 4. *See also Frankel,* 55 F.R.D. at 336 (stating that the requirement of individual proof of reliance, "[c]arried to its ... logical end, ... would negate an[y] attempted class action under Rule 10b–5, since ... reliance is an issue lurking in every 10b–5 action") (quoting *Green v. Wolf Corporation,* 406 F.2d 291, 299 (2d. Cir.1968)) (internal quotation marks omitted). *Simpson, Kirschner,* and *Malone,* however, were decided under facts where the "fraud-on-the-market" theory was satisfied, so their statements respecting reliance are largely dicta.

In addition, where securities fraud classes have been certified, it has often been on the assumption that class management techniques could minimize the predominance of individualized issues at trial. For example, in *Kirschner,* the court stated that "[i]n the event that individual issues of reliance pose difficulties as to case management at a later stage, there are mechanisms available to effectively litigate the reliance questions without destroying the efficiency of class proceedings on all other issues." *Kirschner,* 139 F.R.D. at 83 (certifying a class despite potential reliance issues as to the state law claims propounded; reliance was presumed as to federal claims under the "fraud-on-the-market" theory); *Simpson,* 149 F.R.D. at 102; *Deutschman,* 132 F.R.D. at 383–84 (D.Del.1990); *Frankel,* 55 F.R.D. at 336. Thus, these courts have bifurcated the trials on liability and damages, reserving the question of whether class certification was appropriate as to the damages issues until the liability stage had been completed. *See, e.g., Deutschman,* 132 F.R.D. at 384. The cases cited generally involve classes much smaller than the one proposed here (potentially, over 30,000 Masters Program investors). In *Simpson, Kirschner,* and *Frankel* the class certified was relatively small, with only over 300 members in *Simpson,* just over 1,500 in *Kirschner,* and over 650 in *Frankel. See also Deutschman,* 132 F.R.D. at 372 (2000 class members).

Moreover, the Fourth Circuit has stated its conviction that bifurcating trials in cases where the damage and reliance phases will be complex is not a solution because it does little more than postpone difficult issues and preserve them for a later date. *Windham,* 565 F.2d at 71–72 (stating that a trial court cannot assess certification by "look[ing] exclusively to only one aspect of the case ... [it] can and must look at the case as a whole and ... consider proof of damages as well as other issues .... Whether dealt with in a unitary trial or in a severed trial, the problem of proof of individual injury and damage will remain and severance could only postpone the difficulty of such proof."). *Cf. Lukenas,* 66 F.R.D. at 72 (stating that the opt-out device should not be used to meet the prerequisites under Rule 23).

## CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Class Certification is DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.